## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CALIFORNIA CLINICAL
LABORATORY ASSOCIATION
1127 Eleventh Street, Suite 820
Sacramento, CA 95814, and

JANE DOE,

       Plaintiffs,

  v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,
200 Independence Avenue, SW
Washington, DC 20201,

       Defendant.

## COMPLAINT

COME NOW Plaintiffs California Clinical Laboratory Association ("CCLA") and Jane Doe (collectively, "Plaintiffs"), by and through their attorneys Hooper, Lundy & Bookman, P.C., who bring this action against Defendant Secretary of Health and Human Services ("Secretary"), alleging as follows:

### PRELIMINARY STATEMENT

1.    Unless declared invalid and enjoined by the Court, private contractors known as Medicare Administrative Contractors ("MACs") will continue to develop and apply Medicare Local Coverage Determinations ("LCDs") that establish Medicare coverage policies effectively depriving Medicare beneficiaries throughout the United States of critically necessary clinical laboratory services ordered by their physicians for the treatment and management of diseases and medical conditions.

2.  The current LCD development process and the resulting LCD policies of the MACs are legally invalid and *ultra vires* because:

   a.  They are the product of an unconstitutional delegation by Congress of regulatory policymaking authority to private entities in violation of Article 1, Section 1 of the United States Constitution;

   b.  They implement substantive Medicare policy without being promulgated pursuant to the rulemaking requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, as required by 42 U.S.C. § 1395hh(a);

   c.  They are based on criteria that are not permitted to be considered by MACs in developing LCDs when determining whether particular services are reasonable and necessary for the diagnosis and treatment of a disease or condition under 42 U.S.C. § 1395y(a)(1), such as whether the services are allegedly experimental or investigational;

   d.  They are being applied to deny Medicare coverage for laboratory services despite the fact that the Secretary has failed to implement the statutory procedures required by Congress, including a procedure for assuring the nationwide consistency of LCDs and a mediation process mandated by 42 U.S.C. §§ 1395y(*l*)(5) and 1395ff(i), respectively, causing inconsistent treatment of Medicare beneficiaries in different regions of the country and other harmful consequences; and

   e.  The executive department over which the Secretary presides, the United States Department of Health and Human Services ("HHS"), has eliminated any meaningful opportunity for laboratories to administratively appeal the application of LCDs to laboratory services by unilaterally suspending the only portion of the administrative appeal process where laboratories have any chance of avoiding the impact of adverse LCDs and of obtaining coverage for a laboratory service for a particular Medicare claim.

**JURISDICTION AND VENUE**

3.     The Court has jurisdiction under 28 U.S.C. § 1331 to resolve the very important federal questions, including the significant constitutional issue, posed by the Complaint.  The Court also has jurisdiction under 28 U.S.C. § 1361 to mandate the Secretary's compliance with the mandatory constitutional and statutory provisions at issue.  And, with respect to the plaintiff enrollee, Jane Doe, this Court has jurisdiction under 42 U.S.C. § 1395ff(f)(3) to resolve the purely legal issues here without requiring any exhaustion of any administrative procedures.  Under the separation-of-powers doctrine, Congress may not preclude judicial review of its unlawful delegation of authority to private entities and other constitutional issues when such review is requested by parties adversely affected by such unconstitutional acts, including the laboratory members of CCLA here.

4.     Venue lies in this judicial district under 28 U.S.C. § 1391.

**PARTIES**

5.     Plaintiff CCLA is a nonprofit California trade association whose members include large national laboratories and smaller regional and local laboratories.  CCLA's members also include laboratories that provide specialty tests, including molecular diagnostic testing (described below), on a nationwide basis.  When ordered by patients' physicians, laboratory testing generates test results that are used by the physicians for the ongoing treatment and management of their patients' conditions and diseases. CCLA members are all properly licensed and certified as clinical laboratories under the relevant state and federal laws and regulations, including the Clinical Laboratory Improvement Amendments of 1988 ("CLIA").  *See* 42 C.F.R. pt. 493 (setting forth extensive quality requirements for CLIA-certified laboratories).   Among CCLA's goals is encouraging greater efficiency, reliability, and safety in the performance of clinical laboratory testing and providing the public, including Medicare beneficiaries, with adequate access to such

testing. CCLA members are adversely affected by the LCD process because certain laboratory testing ordered by patients' doctors, discussed below, is not being covered and paid for by Medicare due to the implementation of various LCDs identified below. Therefore, due to the LCDs discussed below, CCLA's members have been, and continue to be, denied Medicare coverage for tests actually ordered and performed.

6. Plaintiff Jane Doe is an 82-year-old Medicare beneficiary and retired registered nurse who resides in Virginia. She is using the pseudonym "Jane Doe" for this matter to protect the confidential nature of her specific health information. She is, however, a Medicare Part B enrollee who suffers from several chronic conditions requiring the administration of numerous drugs, all of which have been prescribed by her physician. She has on several occasions suffered allergic and other very serious adverse reactions to such drugs. In fact, she even reported the adverse reactions to the Food and Drug Administration ("FDA"). To obtain information about the drug risks and other highly valuable information specific to her medication and treatment, her physician recently ordered pharmacogenomic testing from a clinical laboratory in Virginia. Jane Doe has learned that Medicare will not cover or pay for such testing because of a policy contained in an LCD issued by a MAC, LCD No. 34999, described below in paragraph 32. This non-coverage policy jeopardizes her and similarly situated Part B enrollees' access to medically necessary laboratory services.

7. Defendant Secretary of Health and Human Services heads HHS, which administers the Medicare Program through its operating component, the Centers for Medicare & Medicaid Services ("CMS"). The Secretary is sued in her official capacity only.

## BACKGROUND AND FACTUAL ALLEGATIONS

### The Medicare Program

8. Congress added Title XVIII to the Social Security Act in 1965 to establish the Medicare Program, the nationwide health insurance program for the aged and disabled. Title XVIII is commonly known as the Medicare Act.

9. While the Medicare Act contains various standards for administering the Medicare Program, Congress authorizes the Secretary to establish Medicare policy consistent with these standards through the promulgation of formal regulations. The Secretary, through CMS and other governmental sub-agencies, has promulgated thousands of such regulations beginning at 42 C.F.R. § 400.200. The policies in LCDs, however, are not promulgated by the Secretary or her governmental employees, but rather are established on an *ad hoc* basis by the MACs without going through the rulemaking process used by the Secretary to promulgate Medicare regulations.

10. The very first provision of the Medicare Act, 42 U.S.C. § 1395, prohibits the Federal Government from exercising any control over the practice of medicine or the manner in which medical services are provided through the Medicare Program. As indicated above, all of the laboratory testing involved in this lawsuit will have been ordered by the patients' treating or consulting physicians to treat and manage the patients' medical problems. In many instances, the policies at issue in the LCDs interfere with the manner in which medical services are provided to Medicare beneficiaries because they do not cover the laboratory testing ordered by physicians to treat and manage their patients' conditions.

11. Congress established Part A of the Medicare Program to cover institutional health care services, such as hospital inpatient services. Congress further established Part B of the Medicare Program to cover medical and related services furnished by physicians and clinical laboratories to Medicare "enrollees." This lawsuit is limited to Medicare coverage for clinical

laboratory services furnished under Part B of the Medicare Program to Part B "enrollees." However, many other programs, including state Medicaid programs and private health insurance programs, follow Medicare principles to determine coverage and payment rules for their respective programs' beneficiaries. For example, private insurance policies may use Medicare LCDs as a basis for denying coverage for particular services furnished to privately insured patients.

12. With some exceptions not relevant here, Congress has limited Medicare coverage for Part B Medicare services to services that are reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. 42 U.S.C. § 1395y(a)(1)(A). Consistent with this requirement, the Secretary promulgated 42 C.F.R. § 411.15(k), which incorporates the "reasonable and necessary" requirement of the statute in general. The Secretary has also promulgated 42 C.F.R. § 410.32(a), which specifically requires (a) laboratory tests to be ordered by the patient's treating or consulting physician for the treatment of the patient's condition, and (b) the results of such testing to be used in the management of the patient's specific condition, in order to meet the requirements of § 411.15(k). The laboratory tests at issue here are not "screening" tests, i.e., tests ordered for asymptomatic patients. All tests at issue here have been ordered by the patients' physicians to guide the physicians' treatment and management of the patients' existing diseases or conditions and therefore meet this statutory and regulatory standard.

### MACs and LCDs

13. Not surprisingly given the size and complexity of the Medicare Program, Congress expressly authorized the Secretary and CMS to use private contractors, the MACs, to help administer the Medicare Program, including Part B. Under 42 U.S.C. §§ 1395u(a) and 1395kk-1, MACs are authorized to perform various functions, including Medicare payment functions.

14. Twelve different MAC "jurisdictions" currently cover all of the States and certain federal territories for most Medicare Part B services, including clinical laboratory services. For

example, the District of Columbia, along with certain nearby States, is in Jurisdiction L, and California, along with other nearby States and some territories, is in Jurisdiction E.

15. Some Part B MACs have more than one jurisdiction to cover. For example, Palmetto GBA ("Palmetto") and Noridian Healthcare Solutions, LLC ("Noridian") control three different jurisdictions with 20 States under their jurisdiction. The remaining States and territories are divided among six other MACs. These six include Novitas Solutions, Inc., and First Coast Service Options, Inc., which are under common control and preside over three jurisdictions covering 13 States and two territories. Some of the MACs are owned by private insurers. For example, National Government Services, Inc., the MAC for two jurisdictions, including 10 States, is owned by Wellpoint (formerly consisting of Wellpoint and Anthem), the largest private health insurer in the country. Similarly, Palmetto is owned by Blue Cross of South Carolina, a for-profit health insurer. Overly restrictive Medicare coverage and payment decisions by the MACs thus can have a positive financial impact for the MACs' related owners and companies if the Medicare LCD policies are used in the policies governing privately insured patients.

16. The single MAC function at issue here is Congress's decision to delegate to the MACs the function of developing and applying Medicare coverage policy through LCDs. *See* 42 U.S.C. § 1395kk-1(a)(4). LCDs are defined in 42 U.S.C. § 1395ff(f)(2)(B) as determinations made by a MAC (previously known as a Medicare fiscal intermediary or carrier) "respecting whether or not a particular item or service is covered on a [MAC-wide] basis under such parts, in accordance with section 1395y(a)(1)(A) of this title." This definition is also contained in 42 C.F.R. § 400.202. As pointed out above, § 1395y(a)(1)(A) and its implementing regulation, 42 C.F.R. § 411.15(k), require services to be reasonable and necessary to the diagnosis and treatment of a disease or condition to be covered by Medicare. There are numerous other coverage requirements contained elsewhere in § 1395y(a) and in § 411.15, which MACs may *not* use to deny coverage through an

LCD under the plain, mandatory language of § 1395ff(f)(2)(B). This includes experimental and investigational devices under 42 C.F.R. § 411.15(o) since only § 411.15(k) implements § 1395y(a)(1)(A).

17. LCDs are to be distinguished from National Coverage Determinations ("NCDs"), which are required to be developed by the Secretary rather than the MACs. NCDs have national effect and are required to be promulgated by the Secretary pursuant to a policymaking process similar to the APA rulemaking process. 42 U.S.C. § 1395y(*l*)(1)-(4). Thus, NCDs are expressly exempted from the APA rulemaking requirements. However, to be effective, all other Medicare policies that establish new or change existing Medicare legal standards must be established pursuant to the APA under 42 U.S.C. § 1395hh(a).

18. The Secretary is statutorily required to have a plan for providing consistency among different LCDs issued by different MACs in different jurisdictions of the country. 42 U.S.C. § 1395y(*l*)(5). The Secretary is also statutorily required to establish a mediation process to resolve disputes among various stakeholders regarding LCD issues. 42 U.S.C. § 1395ff(i). The Secretary has failed to satisfy these statutory requirements, which impose clear, nondiscretionary duties on the Secretary.

### The LCD "Appeal" Processes

19. MACs do not promulgate LCDs pursuant to the APA even though LCDs routinely establish new Medicare coverage policy or change existing policy. And, neither the Secretary nor CMS reviews or approves LCDs. Rather, once LCDs are issued as final LCDs, they become the final Medicare coverage policy for the services discussed in the LCDs within the jurisdiction covered by the MAC.

20. Some clinical laboratory tests are ordered by physicians who are geographically distant from the clinical laboratories performing the testing, including some of CCLA's laboratory

members.  This may occur because of the unique testing offered by the laboratories or other needs of the ordering physicians.  For example, a particular clinical laboratory furnishing particular kinds of molecular diagnostic laboratory testing services for oncologists often receives orders from doctors at the leading cancer centers throughout the country.   Thus, in many cases, LCDs have a nationwide effect on laboratory services because a single MAC is responsible for the laboratory offering the services nationwide.  In other situations, different MACs in different regions might treat the same type of laboratory test differently from a coverage standpoint.  Therefore, Part B enrollees in different parts of the country receive different Medicare benefits depending solely on the policymaking of the MAC in the area where the laboratory furnishing the testing is located.

21.   Recognizing this particular flaw in the MACs' LCD process, HHS's Office of Inspector General ("OIG") issued a report in January 2014, No. OEI-01-11-00500, criticizing various aspects of the LCD process, including objecting to the inconsistency of different LCDs and of the "blanket denials" made by some MACs in some regions for some services.  The OIG also noted that (a) the Medicare Payment Advisory Commission, a statutorily designated expert group, recommended in 2001 that Medicare eliminate LCDs; and (b) the Government Accountability Office criticized the "broad discretion" given to MACs because such discretion "resulted in variations of coverage."  OIG Report at 4, 10.

22.    CMS has issued guidelines in a Medicare manual for MACs to use to give notice of draft LCDs.  Under these guidelines, Part B enrollees are not given notice of proposed LCDs; instead, MACs "shall solicit comments from the medical community."  The MACs also are required to post draft LCDs on their websites.  *See* Medicare Program Integrity Manual § 13.7.  Nothing in the guidelines requires a MAC to give any particular weight to the comments submitted by laboratories and test-ordering doctors, and MACs seldom do so, as shown by the LCDs discussed

below.  In short, MACs have the complete discretion to ignore comments from laboratories and ordering physicians and/or to rely on comments received through *ex parte* communications.

23. Congress established a formal appeal process for Part B enrollees, only, to challenge LCDs *after* they go into effect. 42 U.S.C. § 1395ff(f). Regulations applicable to this process are at 42 C.F.R. §§ 426.100-426.130.  Obviously, an enrollee must know about the process to use it. Moreover, to pursue this process, an enrollee must demonstrate a need for a particular item or service that is being excluded from coverage by an LCD.  The enrollee must also submit highly technical information to successfully challenge an LCD through this process.

24. Providers and suppliers of the services, including clinical laboratories, which are in the best position to produce the information necessary to challenge an LCD, are not permitted to pursue this process on behalf of a patient and cannot use this process, themselves, to challenge LCDs. 42 U.S.C. § 1395ff(f)(5). Laboratories and other suppliers of Part B services may therefore only proceed through a separate administrative appeal process, under 42 U.S.C. § 1395ff(b), on a Medicare claim-by-claim basis after coverage for their testing has been denied by a MAC pursuant to an LCD.  In other words, laboratories must wait until a Medicare claim for a particular patient is denied by the MAC before they can pursue an appeal of the claim.  Moreover, under this other process, the laboratories may not challenge the validity of an LCD itself.  Additionally, the administrative law judge ("ALJ") who hears the laboratory's appeal in this other process must give "substantial deference" to the LCD used by the MAC to deny a laboratory's Medicare claim. *See* 42 C.F.R. § 405.1062(a).  Making matters worse, the Chief ALJ for this process recently put a minimum two-year hold on the ALJ process due to a backlog of Medicare appeals. *See* Mem. from Nancy J. Griswold, Chief ALJ, Office of Medicare Hearings & Appeals, to Medicare Appellants (Dec. 24, 2013).  Thus, it will be years before a laboratory can even attempt to avoid the application of an adverse LCD for a claim for laboratory services ordered by a doctor today for a Medicare

patient. Several of the laboratory members of CCLA currently have administrative appeals pending and/or will be filing additional appeals, which will be adversely affected by the delay caused by the two-year hold on ALJ appeals.

25.     Congress has mandated that Medicare payment for laboratory services be made on the basis of a national fee schedule. 42 U.S.C. § 1395*l*(a)(2)(D). Medicare payment is not at issue here. Rather, Medicare coverage of services is at issue. If a MAC does not cover a service due to a particular LCD, Medicare will not pay for it.

### The LCDs at Issue

26.     HHS acknowledges that since the inception of the Medicare fee schedule for laboratory services, there has been "a significant amount of technological change in the clinical laboratory area . . . ." Proposed Rule, 78 Fed. Reg. 43,282, 43,350 (July 19, 2013). HHS further notes that many new technologies now exist that did not exist when the fee schedule was established, most notably genetic and genomic tests used by physicians to "personalize" the delivery of medical services for their patients. The new technology includes laboratory-developed tests, which use sophisticated proprietary technology. *Id.* While HHS, through CMS, has requested comments on the Medicare payment policy for the new testing, as reflected in the discussion in the July 19, 2013 Federal Register, HHS and CMS defer totally to the MACs to determine Medicare coverage for such tests. And, as shown below, over the considerable opposition of clinical laboratories and other affected parties, MACs are making blanket denials of coverage for testing ordered by physicians for their patients based on LCDs the MACs develop exclusively.

27.     Genetic testing is also known as "molecular diagnostic testing." It uses laboratory analyses of nucleic acids (DNA/RNA) to detect variants in genes that may be indicative of disorders and also to test for histocompatibility antigens. This technology is now available due to the results of the Human Genome project. As indicated above, the testing at issue here does not involve genetic

testing for asymptomatic patients, such as screening tests for those who might want to know their susceptibility to breast or ovarian cancer due to hereditary factors. Rather, the testing at issue in this action is testing ordered by doctors to guide and manage their treatment of patients who have *active* and often deadly diseases, such as lung and other forms of cancer. For example, the results of a particular type of molecular diagnostic test might be used by a physician to advise a patient about whether to forego a chemotherapy regimen following a surgical excision of a particular type of malignant tumor when the test results show that for this particular patient, it is unlikely the cancer will metastasize (spread) to other organs given the patients' genetic makeup. Such a result could spare a particular patient the toxic side effects of chemotherapy, which chemotherapy actually only helps about one-half or less of the patients who receive it from their doctors. Before such laboratory testing existed, all patients with a particular kind of cancer would be administered the same chemotherapy regimen pursuant to standard treatment protocols, whether or not the cancer was going to spread to other parts of the particular patient's body without such chemotherapy.

28.     One of the first LCDs developed by a MAC regarding Medicare coverage for molecular diagnostic testing is LCD L24308, issued by Noridian in 2006. In this LCD, Noridian acknowledges that "there are numerous potentially medically reasonable and necessary 'therapy directing' genetic tests, either currently available or in the development 'pipeline' for emerging use in coming months and years." But, the LCD substantially limits coverage beyond a relatively few genetic tests used in a relatively few situations. According to this LCD, Noridian "has decided that no additional 'personalized medicine' or 'therapy-directing' testing will be included under the coverage of this LCD." However, in this same LCD, at page 5, Noridian specifies that coverage for such tests will nevertheless be allowed in the future "based on applicable FDA approval and labeling (if such exists) and appropriate standard of reasonableness and necessity." Essentially, this meant that laboratories would have to pursue administrative appeals for other genetic tests after claims

were denied and proceed on a case-by-case basis through the administrative appeal process, which has recently been placed on hold.

29. In 2011, however, another MAC, Palmetto, issued Draft LCD L32288, which created considerable controversy in the clinical laboratory field because it drastically changed the standard for coverage for molecular diagnostic testing. Under this LCD, at page 2, Palmetto confirmed its policy of "non-coverage" for *all* molecular diagnostic tests that are not explicitly covered by an NCD, an LCD, or a coverage article published by Palmetto. Palmetto further held that until it determines whether a particular test meets Medicare's reasonable-and-necessary requirement, the test will be considered "investigational" and not covered by Medicare. Not surprisingly, many laboratories, doctors and other health care professionals objected to this LCD. Moreover, the process for obtaining Palmetto's approval has become unworkable and is based purely on *ad hoc*, subjective criteria that are changed at the whim of the MAC's medical directors. The problems are addressed in the March 11, 2013 letter from the American Clinical Laboratory Association, a national trade group of laboratories, to Palmetto's Medical Director, copy attached as Exhibit A. In sum, this national association stressed that Palmetto's blanket denial policy in the LCD "will restrict patient access and negatively affect medical diagnosis and treatment for Medicare beneficiaries." Exhibit A, page 1. Several months later, CCLA met with HHS/CMS officials to try to alleviate some of the ongoing major problems resulting from this LCD. *See* October 10, 2013 letter, Exhibit B, confirming the substance of the meeting.

30. However, rather than fixing the problems, Palmetto finalized additional LCDs, which set forth the same blanket denial policy for molecular diagnostic testing not specifically approved by Palmetto. For example, Palmetto published a draft LCD, LCD L33599 in 2013, which confirmed Palmetto's policy that unless a molecular diagnostic test was expressly approved by Palmetto, it would be considered non-covered. In a 16-page letter, dated August 29, 2013 (Exhibit C), the

Association for Molecular Pathology, a national association of doctors, scientists, and representatives from leading academic hospitals, stressed the negative impact of this policy on Medicare patients and pointed out the lack of empirical support for the blanket denial policy. Yet, Palmetto made the draft LCD final effective January 30, 2014.

31. In or about September 2013, Noridian replaced Palmetto as the MAC for Jurisdiction E, which includes California and other Western States, and issued a final LCD, L33541, without giving any prior notice or soliciting any comments, confirming that it was adopting as its policy Palmetto's policy regarding molecular diagnostic testing, discussed above. In the meantime, at least two other MACs have issued their own policy for molecular diagnostic testing through LCD L33703 and Draft LCD L34506, which policy is different from Palmetto's and Noridian's policy.

32. More recently, Palmetto has issued yet another LCD affecting coverage for molecular diagnostic testing in the field of pharmacogenomics -- Draft LCD 34999. Pharmacogenomic testing is ordered by doctors to provide them with information about the risks inherent in the treatment of patients with pharmaceuticals. Serious, disabling and fatal adverse events associated with therapeutic drugs are well documented. For example, in 2012, the FDA, itself, received a total of 210,648 domestic reports of such incidents. *See* Institute for Safe Medication Practices, "Leading Drug Safety Issues of 2012," *Quarter Watch,* 2012 Q4 (2013). Obviously many more incidents went unreported to the FDA. Pharmacogenomic testing can reduce the risk associated with many medications far greater than the testing proposed to be covered under the Draft LCD, as commenters across the country, including CCLA (Exhibit D) and others (Exhibit E), have informed Palmetto. Notwithstanding these presentations, on March 2, 2014, Palmetto chose to implement the draft as a final LCD effective March 6, 2014, thus depriving Part B enrollees of the benefit of a whole array of safe, effective and economical testing.

33. The laboratory LCDs are not limited to molecular diagnostic testing. For example, MACs have issued LCDs affecting coverage of laboratory testing for drugs of abuse. Different MACs have developed different coverage policies for such testing over the objections of various stakeholders, including CCLA (Exhibit F). Proposed LCDs will disallow coverage for all confirmatory drug testing ordered by physicians for patients suspected of using illicit drugs if a less comprehensive screening test showed negative results for drug use. *See* LCDs DL 35105 and DL 35159. This policy is inconsistent with the standard of medical practice regarding testing for drug abuse. In fact, the Florida and Kentucky Attorneys General and the Florida Assistant Secretary for Substance Abuse and Mental Health submitted comments to the MAC about how destructive this policy will be to efforts throughout the country to stop the abuse of heroin and prescription pain medications and "would walk the science back" by disallowing confirmatory quantitative laboratory testing of the less sensitive cup tests as physicians attempt to combat prescription drug abuse (Exhibit G).

34. Because of the constitutional and statutory violations discussed herein, CCLA and its members and Medicare Part B enrollees, including Jane Doe, are being, and will continue to be, harmed due to the deprivation of rights assured by the constitutional and statutory provisions at issue here. Specifically, Medicare Part B enrollees are being denied access to extremely valuable clinical laboratory tests that their doctors order or would likely order if the MACs did not develop and apply the LCDs discussed above.

35. Furthermore, the Secretary and the MACs, as agents of the Secretary, are required to follow and abide by the mandatory provisions of the controlling Medicare statutes and regulations as discussed herein.

## CAUSES OF ACTION

### COUNT I:
### Congress Has Unlawfully Delegated Regulatory Power to the MACs

36. Plaintiffs repeat and reallege paragraphs 1-35 as if set forth fully herein.

37. Article I, Section 1 of the United States Constitution vests all federal legislative powers in Congress. The Constitution therefore bars Congress from delegating regulatory power to private entities.

38. Congress's express delegation to MACs of the authority to develop and apply LCDs pursuant to 42 U.S.C. § 1395kk(a) violates Article I, Section 1 of the United States Constitution because, in delegating the authority to develop LCDs to MACs, Congress has unlawfully delegated critical Medicare regulatory policymaking authority to private entities.

### COUNT II:
### As the Secretary's Agents, MACs Have Violated 42 U.S.C. § 1395hh(a)

39. Plaintiffs repeat and reallege paragraphs 1-35 as if set forth fully herein.

40. The MACs' practice of developing and implementing Medicare policy through the informal procedures of soliciting comments from the "medical community" and not enrollees and others before finalizing and implementing LCDs violates 42 U.S.C. § 1395hh(a), which requires new Medicare policy, such as the Medicare coverage policies of the LCDs, to be promulgated pursuant to the rulemaking requirements of the APA.

### COUNT III:
### As the Secretary's Agents, MACs Have Violated 42 U.S.C. § 1395ff(f)(2)(b)

41. Plaintiffs repeat and reallege paragraphs 1-35 as if set forth fully herein.

42. MACs are limited to developing LCDs based exclusively on the requirements of 42 U.S.C. § 1395y(a)(1)(A) pursuant to the mandatory language 42 U.S.C. § 1395ff(f)(2)(b). Section 1395y(a)(1)(A), in turn, is limited to excluding Medicare coverage for items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." The Medicare regulation generally implementing this

statutory requirement is 42 C.F.R. § 411.15(k), which similarly limits Medicare coverage to items and services reasonable and necessary for the diagnosis or treatment of an illness, etc. And, the specific Medicare regulation dealing with laboratory services, 42 C.F.R. § 410.32(a), indicates that to be considered reasonable and necessary under the controlling regulation, § 411.15(k), laboratory and other diagnostic services must be ordered by a patient's attending or consulting physician for the treatment of patient's specific medical problem and used for the management of that medical problem.

43. Notwithstanding the fact that the MACs' statutory directive is limited to these parameters, the MACs routinely use coverage criteria found elsewhere in § 1395y(a)(1) and § 405.211 to develop LCDs denying coverage for laboratory tests, such as basing coverage denial policies in LCDs on the MACs' concept of experimental and investigational services, which is not a criterion found in § 1395y(a)(1)(A), § 411.15(k), or § 410.32(a). Instead, it is a separate criterion found at § 411.15(o) and pertains to medical devices rather than to diagnostic laboratory services. The critical criteria applicable to coverage for clinical laboratory services are contained in § 410.32(a), and are derived from § 1395y(a)(1) and § 411.15(k), as the Secretary pointed out when promulgating § 410.32. *See* Final Rule, 62 Fed. Reg. 59,048, 59,057 (Oct. 31, 1997). In short, laboratory tests must be clinically useful to patients' treating and consulting physicians.

44. The MACs' use of extra-statutory and extra-regulation criteria is *ultra vires* and therefore invalid, as are the LCDs based on the use of such criteria.

### COUNT IV:
### The Secretary Has Violated the Clear,
### Nondiscretionary Duty Imposed By 42 U.S.C. § 1395y(*l*)(5)

45. Plaintiffs repeat and reallege paragraphs 1-35 as if set forth fully herein.

46. Under 42 U.S.C. § 1395y(*l*)(5), the Secretary is required to develop a plan to evaluate new LCDs to determine which should be adopted nationally and to what extent greater consistency

can be achieved among LCDs. As pointed out in the recent HHS OIG report on LCDs (at pages 12-13), this is not being done, effectively causing access issues for beneficiaries.

47. Plaintiffs have no other avenues of relief available to them. For example, the Secretary's recent *ad hoc* decision to suspend the ALJ process available to laboratories to challenge the application of LCDs on a claim-by-claim violates Congress's intent for ALJ hearings to be finalized within 90 days of the filing of an ALJ appeal, as reflected in 42 U.S.C. § 1395ff(d)(1), and also denies laboratories and other affected providers and suppliers procedural due process of the law since delaying hearings for two or more years deprives them of a timely notice and opportunity to be heard. This hearing process is especially important to laboratories and other providers and suppliers with respect to LCDs since they are not permitted to challenge the LCDs through the process available to Part B enrollees only.

## COUNT V:
## The Secretary Has Violated the Clear, Nondiscretionary Duty Imposed By 42 U.S.C. § 1395ff(i)

48. Plaintiffs repeat and reallege paragraphs 1-35 as if set forth fully herein.

49. Under 42 U.S.C. § 1395ff(i), the Secretary is required to establish a mediation process that is to be used to resolve disputes over LCDs when there is a systematic and a large volume of complaints about the LCDs from stakeholders, including groups representing providers. There is and continues to be a large volume of and systematic complaints over the molecular diagnostic testing LCDs as detailed above. Yet, as far as Plaintiffs can determine, there is no mediation process available to them and their members and other affected parties.

50. Plaintiffs have no other avenues of relief available to them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A. An order declaring the LCD process and the resulting LCDs for laboratory services at issue to be invalid and unenforceable;

B. An order enjoining the Secretary, her employees, and her agents, including the MACs, from developing and applying any draft, existing or new LCDs for clinical laboratory

services, including those at issue here, until and unless the violations of the law at issue are corrected and an appropriate and legal process for developing and implementing LCDs is implemented;

C. An order mandating the Secretary and her agents, including the MACs, to comply with all applicable provisions of the Constitution and the Medicare Act and regulations regarding Medicare coverage for clinical laboratory services;

D. Costs and reasonable attorneys' fees incurred by Plaintiffs in bringing this action; and

E. Such other and further relief as the Court considers appropriate.

Dated: April 16, 2014                    Respectfully submitted,

                                         HOOPER, LUNDY & BOOKMAN, P.C.

                                         By: _____
                                         James F. Segroves (DC Bar No. 480630)
                                         975 F Street, NW, Suite 1050
                                         Washington, DC 20004
                                         Phone:  (202) 580-7701
                                         Fax:    (202) 580-7719
                                         E-Mail: jsegroves@health-law.com

                                         Patric Hooper (CA Bar No. 57343)*
                                         1875 Century Park East, Suite 1600
                                         Los Angeles, CA 90067
                                         Phone:  (310) 551-8111
                                         Fax:    (310) 551-8181
                                         E-Mail: phooper@health-law.com

                                         *Counsel for Plaintiffs California Clinical*
                                         *Laboratory Association and Jane Doe*

                                         * *Motion for Admission Pro Hac Vice to Be Filed*