**Exhibit A:**
**March 11, 2013 Letter from American Clinical Laboratory Association to Palmetto GBA**

Plaintiffs' Complaint,
*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*



American
Clinical Laboratory
Association

March 11, 2013

Dr. Elaine Jeter, Medical Director
Palmetto GBA J1 Part B Medical Affairs
P.O. Box 1476
Augusta, Georgia 30903-1476

**RE: Proposed/Draft Local Coverage Determination: Molecular Diagnostic Tests (MDT) (DL 32288)**

Dear Dr. Jeter,

The American Clinical Laboratory Association ("ACLA") hereby submits comments on Palmetto GBA's ("Palmetto's") Draft Local Coverage Determination for Molecular Diagnostic Tests.[1]  ACLA is an association representing clinical laboratories throughout the country, including local, regional, and national laboratories.  As providers of millions of clinical diagnostic laboratory services each year, many of them in Palmetto's Medicare Administrative Contractor jurisdiction, ACLA member companies would be impacted directly by the Draft LCD.

We agree with the Centers for Medicare and Medicaid Services ("CMS") and Palmetto that the Medicare program, through its administrative contractors, is entitled to know what items and services it is paying for on behalf of Medicare beneficiaries and also that those items and services are reasonable and medically necessary.  Regarding this Draft LCD, ACLA believes that the scope is overbroad, as it appears that it would encompass many tests whose medical necessity and clinical utility are widely recognized.  Broadly denying coverage for well-established tests will restrict patient access and negatively affect medical diagnosis and treatment for Medicare beneficiaries.  Additionally, the Technical Assessment process should have consistent and objective standards that are easy for laboratories to understand and abide by and are consistent with New York State and other regulatory oversight agencies.  We have several constructive suggestions for Palmetto as it amends and finalizes the Draft LCD.

**A.    The Scope of the Draft LCD is Overly Broad**

The text of the draft LCD is unclear with regard to what tests it would cover, but on its face, it could be read to apply to almost all testing performed by clinical laboratories, including several long-established tests.  The Draft LCD's definition of a molecular diagnostic test ("MDT") reads:

---

[1] Draft Local Coverage Determination (LCD) for Molecular Diagnostic Tests (MDT) (DL 32288), available at http://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=33028&ContrId=174&ver=15&ContrVer=1&name=174*1&bc=AQAAAgAAAAAAAA%3d%3d&.

1100 New York Avenue, N.W. ⸱ Suite 725 West ⸱ Washington, DC 20005 ⸱ (202) 637-9466 Fax: (202) 637-2050

ACLA Comments on Draft LCD for Molecular Diagnostic Tests (DL 32288)
March 11, 2013
Page 2

> Any test that involves detection or identification of nucleic acid(s)
> (DNA/RNA), proteins, chromosomes, enzymes, cancer chemotherapy
> sensitivity and/or other metabolite(s). The test may or may not include
> multiple components. A MDT may consist of a single mutation
> analysis/identification, and/or may or may not rely upon an algorithm or
> other form of data evaluation/derivation.

We recommend that the definition of MDT be limited to a test for which DNA or RNA is
the analyte of interest; that evaluates a patient's DNA or RNA to determine if there are any
mutations (such as nucleotide changes, deletions, insertions, or rearrangements) that have a
pathological effect; and that employs techniques specific to molecular pathology testing such as
DNA and RNA isolation, polymerase chain reaction ("PCR"), hybridization, and sequence
analysis. This would be a far more precise and accurate definition of a molecular diagnostic test
and would appropriately limit the scope of the LCD to what we assume are its intended targets,
based on its title.

ACLA is concerned, also, by the description of "Applicable Tests/Assays." It is not clear
whether the Draft LCD would apply to any test that meets the definition of MDT *or* one of four
broad criteria, or whether it would apply to a test meeting the MDT definition *and* any one of the
four additional criteria. (Those criteria are: all non-FDA approved/cleared Laboratory
Developed Tests ("LDTs"); all modified FDA-approved/cleared kits/tests/assays; all tests that
use more than one CPT code to identify the service (including anatomic pathology codes); and
all tests that are billed with a "not otherwise classified" ("NOC") code.)[2] The introduction says
"In addition to the MDT definition, this policy applies to all tests that meet at least one of the
following descriptions…" Given the broad scope of the definition of MDT, as proposed, the
Draft LCD would catch thousands of tests in its scope if it applied to all molecular diagnostic
tests *and* to any tests that met one of the other criteria. Even if it applied only to those tests that
are considered MDTs *and* meet at least one of the other criteria, we still believe it would reach a
large number of tests that Palmetto may not intend to reach with the policy.

In a previous iteration of the Draft LCD, released late in 2011, Palmetto agreed not to
apply the non-coverage policy to a test that had received a specific CPT code.[3] It is unclear
whether Palmetto has reversed course and decided to include all Tier I and Tier II molecular
pathology tests in the scope of the LCD, now that those tests have received specific CPT codes.
For reasons discussed more fully below, Palmetto does not need to conduct a Technical
Assessment on tests that have been assigned CPT codes that are recognized by the Medicare
program, and they should be excluded from the application of this policy. This Draft LCD
should apply only to new molecular diagnostic tests (and only those encompassed by a more
limited definition and clarification of the additional criteria) and not to those tests that have been

---

[2] We believe that instead of "All tests that meet the first three bullets and are billed with an NOC code," the last
criteria probably could read "All tests that meet *any of* the first three bullets and are billed with an NOC code," but it
is not clear why it is necessary to add the additional criterion of being billed with an NOC code. For example, a
non-FDA approved LDT would fall under the scope of the policy as drafted, whether or not it was billed with an
NOC code.
[3] The Draft LCD applied to tests that "have not received a specific AMA CPT code."

ACLA Comments on Draft LCD for Molecular Diagnostic Tests (DL 32288)
March 11, 2013
Page 3

recognized and paid for by the Medicare program for more than a decade, such as KRAS and BRAF.

Palmetto should narrow the scope of the Draft LCD by revising its definition of MDT so that it more accurately describes the tests commonly known as molecular diagnostic tests and does not inadvertently (or intentionally) include tests beyond that. Palmetto also should exclude from the scope of the Draft LCD any Tier I or Tier II molecular diagnostic tests that have been assigned CPT codes.[4]

**B.    Too Many Tests Would Be Subject to the Technical Assessment Requirements.**

If a test has been assigned a CPT code through the CPT Editorial Panel, it should not be subject to a Technical Assessment. Conducting a Technical Assessment on each and every KRAS and BRAF test done by every laboratory that submits claims to Palmetto is unnecessary. We recognize that Palmetto has limited resources to conduct the Technical Assessments for the tests, and therefore we believe it will be difficult for Palmetto to process such a great number of tests from multiple laboratories in a timely manner. This is likely to result in a backlog that will delay payment for new tests in particular, as well as for existing tests.

Molecular diagnostic tests that have been assigned CPT codes already have been shown to have clinical utility and validity. It is clear what each of the tests is and what its intended use is. Palmetto should not have to review each molecular diagnostic test's "analytical and clinical validity and clinical utility" if a test has been through a review by the CPT Editorial Panel and has been assigned a CPT code. Further, the Medicare program has recognized the Tier I and Tier II CPT Codes, and it has recognized the value of and paid for the tests represented by them for many years. We believe that if a molecular diagnostic test has an assigned CPT code, it should not have to undergo a Technical Assessment.

Similarly, if a test has received approval through New York State's Clinical Laboratory Reference System ("CLRS"), it should not have to undergo a duplicative Technical Assessment by Palmetto. CLRS has a rigorous test approval process through which laboratories providing tests to New York State patients must demonstrate the test's specifications for accuracy, precision, reportable range of test results, reference intervals, analytical sensitivity and specificity and other applicable performance characteristics, including the clinical sensitivity and specificity of novel assays without comparative methods; assure that the established reference interval is appropriate for the laboratory's population; and, submit validation data and a Standard Operating Procedures Manual for review by CLRS staff in accordance with established guidelines. The universe of tests covered by New York State's CLRS program overlaps in large part with the universe of tests that Palmetto intends to review, and much of the information

---

[4] As an aside, we are puzzled by Palmetto's statement that "the available language in the HCPCS and CPT manuals to describe the pathology and laboratory categories and the tests included in those categories are not specific to the actual test results provided…" It is not clear why such descriptions should specify the test results provided when they are meant to describe the tests themselves.

ACLA Comments on Draft LCD for Molecular Diagnostic Tests (DL 32288)
March 11, 2013
Page 4

submitted to Palmetto will be the same. New York State's CLRS program is a well-established and professional program. Rather than requiring another Technical Assessment, Palmetto should assign unique test identifiers to those tests that have been reviewed and approved already by the CLRS program. This would be consistent with oral and written representations made to ACLA in late November 2011. (See attachment.) At the very least, a laboratory should be able to submit the same dossier that it did to New York State without having to customize it for Palmetto.

C.    **The Technical Assessment Process Should Be More Transparent and Standardized.**

The Draft LCD lacks many details about the Technical Assessment process. For example, it says that a lab "must submit a comprehensive dossier on each new test/assay prior to claim submission," yet there is no information about what must be included in a dossier and how it must be submitted. Some of this information may be included with other information about Palmetto's MolDx program, although that program is not cross-referenced in the Draft LCD, and the program's processes and parameters have shifted repeatedly since it was announced. We believe there is still confusion about what information should be included in the dossier. As a result, laboratories sometimes have to submit information multiple times before a dossier is complete. Moreover, it also appears that the requirements for the dossier seem to vary from one test submission to the next and from one laboratory to the next. As we have suggested in the past, it would be helpful for the entire process and instructions to be set forth in one document that is easily accessible and easily understood. Without clear direction for what should be included and prompt review of the materials submitted in a dossier, the policy in effect could act as a denial of some tests that are reasonable and medically necessary for Medicare beneficiaries.

We are concerned that there are no objective standards for assessing the "analytical and clinical validity and clinical utility" of a test that have been articulated and publicized. Because the LCD states that the tests are non-covered, there should be greater transparency in the Technical Assessment process and a clear statement of the rationale for when the test is considered non-covered. Further, we would like to see a process for appealing and getting a timely review of a decision that a test does not meet the "analytical and clinical validity and clinical utility" tests.

D.    **Conclusion**

ACLA recommends that Palmetto narrow the scope of the Draft LCD by amending the definition of MDT to encompass only those tests that truly are molecular diagnostic tests. Also the LCD should only apply to new tests that have not been validated in another way, such as being described by a CPT code or being approved by the New York State CLRS program. We also are concerned that broadly denying coverage for widely recognized and clinically accepted tests will restrict patient access and negatively affect medical diagnosis and treatment for Medicare beneficiaries. Finally, we request there be objective written standards for each

ACLA Comments on Draft LCD for Molecular Diagnostic Tests (DL 32288)
March 11, 2013
Page 5


Technical Assessment and a reasonable appeal process that would help promote fairness and impartiality in the approval process.  Thank you for your attention to our concerns.

Sincerely,

Alan Mertz, President


Attachment

**Exhibit B:**
**October 10, 2013 Letter from California Clinical Laboratory Association to CMS**

Plaintiffs' Complaint,
*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*



**CALIFORNIA
CLINICAL
LABORATORY
ASSOCIATION**

1127 Eleventh Street, Suite 820 ● Sacramento, CA 95814 ● (916) 446-2646

October 10, 2013

Louis Jacques, MD
Director, Coverage and Analysis Group
Center for Medicare Management
Centers for Medicare and Medicaid Services
Room C4-01-26
7500 Security Boulevard
Baltimore, MD 21244

    **Re: Palmetto MolDx**

Dear Dr. Jacques,

The California Clinical Laboratory Association (CCLA) would like to express our thanks for the opportunity to meet with you and your staff on August 8, 2013. Since 2008, we have worked closely with Palmetto GBA (Palmetto) to provide comments on how the MolDx program can be designed and managed under the existing law and regulations of the Medicare program. Since CMS has oversight over the MolDx program, we used this meeting as an opportunity to share our stakeholder concerns with you and your staff. During the course of our meeting, we strongly described a number of our substantial concerns regarding the implementation of Palmetto's MolDx program. With your group, as with Palmetto, our hope is to craft a consensus that will allow the MolDx program to fulfill its stated intent, both for the jurisdictions that are currently utilizing MolDx and for any future expansions to new geographies.

This letter serves as the proposal you requested us to provide as a follow up to that meeting. CCLA supports the intent of the MolDx program to establish transparency, evidentiary standards for technology assessments (TA), and a clearer, more consistent path for coverage and payment. However, the program design and operations must be consistent with regulations that guide the applicable state and federal programs. This is especially important since this program is <u>not</u> monitored as a designated innovation project under the Center for Medicare & Medicaid Innovation (CMMI). We discuss both longstanding and current concerns about the manner in which the program has been implemented to date. Our goal in this document is to present and explain our concerns, make clear how they reflect real problems that are counterproductive to CMS goals, and provide potential solutions. We summarize our proposed solutions in the conclusion.

**Concern 1: MolDx violates multiple aspects of due process**

1. The foundational LCD for MolDx is improper in scope.

Our foremost concern is based on the "foundation" of the MolDx program: LCD L32288, Molecular Diagnostic Tests, which essentially states that any and all molecular tests that are not specifically mentioned as a covered service are considered non-covered. This overreaching LCD was opposed by many constituents comprising the CAC. The same "foundational" MolDx LCD is in the process of being duplicated in J11 (NC/SC/VA/WV), where opposition and concerns have been publicly described by the Association for Molecular Pathology as well.[1]
The LCD is contrary to Medicare negotiated rule making criteria regarding the LCD process for laboratories; violates the Program Manual chapter for LCDs; and puts any laboratory provider that performs these tests in the MolDx jurisdiction at a large disadvantage over similar laboratories elsewhere. As such, we have repeatedly requested that this improper LCD should be rescinded. Both CCLA and ACLA had been promised that this LCD would be rewritten as a coverage LCD, as opposed to an open ended non-coverage LCD; however, nothing has been initiated. We believe that an LCD should not be written for anything other than a specific and evidence based coverage or non-coverage decision for a specific test or condition -- as was originally intended in negotiated rulemaking. The program manual states that all LCDs must be based on analysis of evidence, whereas the MolDx LCD simply states without citation that all tests Palmetto has not yet had time to review are medically unnecessary, regardless of the applicable data.

2. The Ongoing MolDx Publication Process violates Manual instructions.

An LCD is statutorily defined as a coverage decision that is based on the "reasonable and necessary" standard and is binding in a MAC jurisdiction. The program manual provides very clear instructions about how to promulgate an LCD. This process is clearly described in the Medicare Program Integrity Manual, which was revised as recently as June 21, 2013. Section 13.7.2 of the manual states that a draft LCD must be published and requires a minimum 45 day comment period before that LCD can be finalized. Section D also articulates a requirement for an open CAC meeting: "Contractors shall provide open meetings for the purpose of discussing draft LCDs. Carriers shall hold these open meetings prior to presenting the policy to the CAC. To accommodate those who cannot be physically present at the meetings, contractors shall provide other means for attendance (e.g., telephone conference) and accept written or e-mail comments...Interested parties (generally those that would be affected by the LCD, including providers, physicians vendors, manufacturers, beneficiaries and caregivers) can make presentations of information related to draft policies..." Yet, Palmetto has stated that LCD L32288 allows it to post non-coverage decisions at will, without the benefit of, and without the right to, any of the formal LCD and CAC processes set forth in the Program Manual, including its notice and comment provisions.

---

http://www.amp.org/publications_resources/position_statements_letters/documents/2013/Palmetto%20DLCD%20MDT%20DL33599.pdf    [AMP complaints about extension of MOLDX to J11].

Although all other CMS contractors continue to follow the Program Manual process, Palmetto's MolDx program does not, and LCD L32288 specifically did not. The justification provided by Palmetto is that their coverage by article process is "more expedient." But expediency is not a sufficient justification for ignoring due process. The procedures for LCDs mandated in the Program Manual are less expedient for good reason. They are designed to ensure that the end result is legitimately obtained after appropriate notice and opportunity for comment, and that the end result is a good policy because it has been informed by stakeholder input. To ignore these processes for the sake of expediency is to risk an illegitimate outcome that is bad policy, and that is exactly what has occurred in this instance.

In some cases, Palmetto has argued that specific tests that are non-covered are "statutorily excluded" from Medicare coverage. However, for laboratory tests, statutory exclusions are typically screening tests where there are no signs or symptoms of a disease. Palmetto has created a similar "statutory exclusion" if it thinks a test is not actionable enough or if it is de facto "prognostic." Definition of what specifically constitutes "signs" of disease and the "actionability" of results can be subjective and therefore potentially controversial – this is why it should be exposed to the LCD process (In addition, these reasons for non-coverage are paraphrases of the reasonable-necessary concept, and therefore fall under the protections and process of SSA 1862 decisions for LCDs). CCLA members are concerned that under Palmetto's internal process, some prognostic tests have been deemed to have adequate clinical utility for coverage without further predictive evidence, while others have not.

### Concern 2: The MolDx Review Process Lacks Transparency and is Inconsistent

Palmetto's staff openly admit that their TA process relies very heavily on external subject matter experts (SMEs). The identity and number of these subject matter experts is unknown, which concerns us because of the lack of transparency and the possibility for conflicts of interest. However, our greater concerns are the clearly inconsistent standards to which different dossiers are held by different reviewers, as well as the long and unpredictable turnaround times for certain reviews (see below). Too often, error-filled assessments are returned to the submitting lab, along with a conclusory statement that the matter is closed for six months and at that time; "new publications" will be reviewed. One recommendation to resolve at least the issue of transparency and facilitate comment and advice would be to develop a CAC-like panel with expertise in molecular diagnostics. Consistent with the precedent set by the national MedCAC process, the MolDx MedCAC panel, as well as their list of SMEs, would be published; thereby facilitating independent expert review while improving the transparency with which those reviews occur. Labs would be provided with the name of the SME assigned for review of their submission, which would also allow the test provider to raise any concerns they may have about reviewers with potential conflicts of interest or insufficient expertise. The creation of this MolDx-specific CAC together with the restoration of the aforementioned LCD process would represent significant improvements over the current MolDx process without being unduly burdensome to participants.

**Concern 3:  MolDx Evidence Standards Can and Should be More Transparent and Consistent**

The reason most frequently given by Palmetto for not having a successful technology assessment is the lack of clinical utility.  While we agree that there needs to be evidence of the actionability of tests, the Medicare regulations do not refer to "clinical utility"; instead, the basic tenet of Medicare coverage is defined as Medical Necessity (Social Security Act § 1862; 42 U.S.C. § 1395y).  Medicare defines medical necessity as services that are "reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member, and not excluded under another provision of the Medicare Program."

Nonetheless, if medical necessity is to be interpreted as "clinical utility", then the standard should be clear and consistent, and reflect an understanding of the realities of medical practice, which unfortunately has not always been the case with Palmetto's dossier reviews.  For example, while Palmetto has favored some companies with approval based on a clinical utility standard of <u>impacting provider decisions</u> (Fryback and Thornbury Level 3, with no health outcome data, let alone demonstrated improvement in health outcomes), others have been declined with almost identical or even higher levels of evidence (Fryback and Thornbury Levels 4 or higher).  In addition, if health outcome benefit is the new desired and regulatorily established standard, then reimbursement regulations must also be changed for pricing to be adjusted accordingly to reflect the heavy additional costs of the prospective multi-year, multi-center randomized clinical studies that presumably will be required.  This has not been the case, however, with MACs using raw cost of goods sold as the benchmark for pricing.  Critical to any technology assessment paradigm for coverage decisions, however, is a value-based mechanism for determining pricing and reimbursement that recognizes exactly how medicine is practiced in the "real world".

**Concern 4:  MolDx Coding Policies**

The 2013 Tier I AMA CPT codes for molecular diagnostic tests were created to provide payor transparency for tests for which coverage and reimbursement are being sought.  These codes were created to be analyte specific but methodology agnostic both for coverage and pricing. However, the MolDx program directly contravenes this intent by requiring methodology specific coding in addition to CPT coding to enable Palmetto to differentiate between laboratory developed tests (LDTs) and FDA-cleared or approved tests for the same analyte.

Although FDA clearance is clearly not a prerequisite for Medicare coverage, Palmetto has taken the position that there are substantial differences between validated LDTs and FDA-cleared or approved tests, and therefore MolDx prices FDA-cleared or approved versions greater than LDTs for the same analyte.   There are several pivotal problems that result.

- Such a blanket policy assumes that <u>all</u> validation dossiers for <u>all</u> FDA-cleared or approved tests are superior to their LDT brethren, which simply is not the case.  In fact, not only is the validation package for certain LDTs superior to that for some FDA-cleared

or approved tests, but the clinical utility of certain LDTs exceeds that of their FDA-cleared or approved counterparts. For example, the pre-market approval (PMA) for Roche's BRAF test, which is a companion diagnostic for Zelboraf, focused only on the V600E mutation. However, after the drug was approved, several studies found two more mutations (V600D and V600K) against which Zelboraf worked that were present in approximately 33% of patients negative for V600E. So, while testing for all 3 BRAF mutations clearly represents the best evidence-based medical practice, and existing LDTs do this while their FDA-approved counterpart does not, the current reimbursement level for the BRAF LDTs is lower than the reimbursement level for the FDA-approved BRAF test, which threatens the continued availability of such LDTs for patients in need of them.

- While MolDx created several tiers of pricing based on FDA approval and other factors, it transmitted only the lowest price to CMS as a CPT payment code, which was then adopted by other MACs and will shape the national price. It does not represent a fair average of the real costs or even the real MAC Medicare payments for the codes.

As you know, MolDx requires the assignment of a program specific identifier to each test. This can be very granular, with different codes for slightly different EGFR or KRAS tests, for example. At first these identifiers were to be exclusively Z codes which are copyrighted by McKesson. Many laboratories expressed concern over this mandate due to the licensure requirements in the vendor agreement, which they viewed as a conflict of interest resulting from the vendor's extensive service portfolio ranging from claims processing and utilization control products to competing laboratory services. In an effort to preserve proprietary information and limit the identifier exercise to a simple code number process, the MolDx program provided a separate Palmetto specific number, the PTI number, so that labs which were unwilling for legal reasons to accept the McKesson licensing agreement could still participate in MolDx. At the request of Palmetto, labs using PTI codes, representing greater than 70% of identifier usage, gave their consent for the public information to be published along with their respective PTI codes in the same manner as Z codes were to be published.

Now, it appears that Palmetto has unilaterally cancelled the PTI program. Palmetto indicated that it had been requested not to publish PTI codes "by CMS" and that the PTI code option would be shut down after August 31 and will not be recognized after January 1, 2014.

This closure of the PTI system and forcing labs to enter legal agreements with McKesson or lose all Medicare payments is simply wrong. There is no other way to put it. CCLA is adamant that identifiers should not be owned by any single for-profit entity, since a numbering system should not be proprietary. Once McKesson eliminates all competitors, such as the PTI system, this multi-billion dollar for profit enterprise will have a free hand to revise contracts against a laboratory, which would be bankrupted (by exclusion from Medicare) by resisting. The private information (supporting a PTI code) is already protected by the MolDx program and public information belongs to the labs and has been made public by the labs. Accordingly, it is the strong recommendation of CCLA that the controversy of who owns the information be eliminated by defaulting to a simple numbering system that is not owned by anyone. It can be established by a simple numbering sequence in the registry itself, which should be viewed as an agnostic technology tool utilized by Palmetto with no interest in ownership of the data.

**Concern 5: The MolDx review cycle is lengthy and unpredictable**

The MolDx technology assessment rules originally required that a response to a TA request be made within 60 days. It now states 120 days. However, even that deadline is rarely met. Many laboratories that submitted requests for review in Q4 of 2012 are still waiting as we enter October of 2013. We believe this represents a poor prediction and poor match of staffing capacity to MolDx's voluntary expansion of its scope and workload. It is easy to be grossly overcommitted and hopelessly behind; the job of management is to predict and avoid that. The MolDx program continues to refine response timelines and Palmetto representatives have represented a willingness to communicate with providers. However, just as timelines are not met, neither is communication consistent. The program cannot succeed without reasonable criteria and the discipline of meeting published timelines and establishing open communication.

## CCLA Proposal Summary and Highlights

As detailed above, the following summarizes the highlights of our proposal for improving the MolDx program:

- Oversight of the MolDx program at the CMS level is required to establish program consistency and adherence to existing regulatory guidelines. The program must have transparency and must provide for stakeholder comment and advice:
  - Restore the statutorily mandated, Program Manual defined LCD process, and rescind LCD L32288
  - Create a MolDx MedCAC, which in turn will develop its panel of SMEs, the membership of which will be publicly disclosed
  - Provide the stakeholders with notice of the SME assigned to their TA submission and allow them an opportunity to comment on the SME selection
  - Clarify the appropriate "reasonable and necessary" standard for Medicare coverage of molecular diagnostic tests and specify what exactly that standard represents.
    - We recommend the standard be to demonstrate that test results of a given diagnostic service influence the clinician's patient management decision
  - Consider incorporation of a registry for new assays to facilitate early adoption while developing evidence for optimized utilization
  - Develop and implement realistic yet expeditious review timelines
  - Restore the PTI option and/or offer a similar, non-proprietary, and non-controversial identifier such as the NIH' Genetic Test Registry code numbers
  - Restore pricing on the basis of a gap fill methodology with the consideration of all elements required by this exercise, rather than favoring FDA approval through

  a pricing mechanism that is likely to deliver the unintended consequence of
  encouraging manufacturers to increase the price of FDA approved kits

- End the arbitrary and improper use of "statutorily excluded" language to justify any
  non-coverage decisions. Negative decisions should be subject to traditional evidence
  and public comment guidelines as established under negotiated rule-making and the
  LCD policy manual

- Support AMA development of more comprehensive and granular codes to allow
  modifications to existing MoPath codes
    o CPT codes should be established to provide a methodology to facilitate the
      reporting of additional mutations or markers that improve the utility of a test
      and allow contractors to determine coverage and pricing accordingly.
    o Support AMA development of new codes that reflect significant technology
      changes which require re-evaluation of coverage and/or reimbursement.
    o Eliminate Tier 2 codes

- Facilitate stakeholder meetings to refine the MolDx program so it can become a national
  standard consistent with existing program regulations


CCLA and its members thank you and your staff for your time and for your thoughtful
consideration of our proposal. As always, we value our productive relationships with CMS at
both the national and local levels, and we remain ready to work with CMS and its Palmetto
contractor to refine the MolDx program to help realize its full potential. This potential is valued
by all of us as a way to provide a transparent, consistent, and effective mechanism for coverage
determination for innovative molecular tests. We look forward to hearing from you.

Sincerely,

Michael J. Arnold
Executive Director

CC:    CCLA Membership
       Tamara Syrek Jensen, Deputy Director, Coverage and Analysis Group, CMS
       Dr. Jim Rollins, Director, Division of Items and Devices, Coverage and Analysis Group, CMS
       Dr. Jeff Roche, Medical Officer, Division of Items and Devices, Coverage and Analysis Group
       Lori Ashby, CMS
       Kim Long, CMS
       Karen Reinhardt, CMS
       Mike Barlow, Vice President, Palmetto GBA
       Dr. Elaine Jeter, Medical Director, Palmetto GBA

**Exhibit C:**
**August 29, 2013 Letter from Association for Molecular Pathology to Palmetto GBA**

Plaintiffs' Complaint,
*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*



**Association for Molecular Pathology**
*Promoting Clinical Practice, Translational Research, and Education in Molecular Pathology*
9650 Rockville Pike, Bethesda, Maryland 20814
Tel: 301-634-7939 • Fax: 301-634-7990 • Email: amp@amp.org • www.amp.org

August 29, 2013

Becke Turner
POB 100190
Columbia, SC 29202-3190
Becke.Turner@Palmettogba.com

RE: Draft Local Coverage Determination: **Molecular Diagnostic Tests (MDT) (DL33599)**

Dear Ms Turner:

Thank you for the opportunity to comment on Draft Local Coverage Determination: Molecular Diagnostic Tests. Molecular diagnostic testing has been a part of standard care for many genetic and cancer indications for many years and performed in CLIA certified and regularly inspected laboratories. The implementation of this DLCD will restrict access by Medicare beneficiaries of all ages to medically indicated testing. We have several concerns about this draft policy and about the impact this will have on molecular diagnostic testing in Jurisdiction 11 and we request that Palmetto reconsider the following issues (briefly listed here):

1. The LCD process is an inadequate tool for describing the implementation of this program while using it as a blanket statement for noncoverage of all molecular pathology procedures except those explicitly stated (Afirma, Allomap, Avise PG, Cancer Type ID, cobas 4800 BRAF V600, Corus Cad, HERmark, MammaPrint, Oncotype DX Breast, Oncotype DX Colon, Progensa PCA3, therascreen, Tissue of Origin, Vectra DA, and Vysis).

2. The scope of this policy as is now defined by the MDT Policy Specific Definitions is too broad. This program of registration and technical assessment should not replace the CMS designated LCD process for the determination of coverage for specific tests (Pub 100-08 PIM, ch.13, Sec 13.1.3). It states it applies to all molecular genetic testing but is only being applied to the new CPT codes for molecular pathology.  The rationale offered is that there is need for better understanding of the test being billed with a code and to ensure appropriate application of coverage limits.  However, we believe that this fails to recognize the identification of those specific tests performed and identified by the current set of Tier 1 codes and believe that these should be excluded from the program. Though the Tier 2 code descriptor does not identify the specific analyte per se, these too could be identified by listing of the gene analyte (as described under the particular Tier 2 code) in the descriptive portion of the claim, where the identifier would be entered.  There are other means available to communicate coverage limitations in the claims processing using HCPCS modifiers.

3. The action proposed in this DLCD represents a withdrawal of existing coverage for molecular pathology tests particularly those identified. In order to withdraw coverage for services where coverage was provided in the past according to the LCD process as described in the PIM 83 Chapter 13, requires that the contractor present the medical evidence which supports its proposed action, specifically, the

AMP Comments                    Palmetto DL33599                    August 29, 2013

evidence that demonstrates that the medical literature and medical standard of practice no longer supports the position that the service is considered to be 'reasonable and necessary'.

4. This draft LCD addresses both coverage issues and coding guidelines, the latter of which is supposed to be dealt with through the Article process.

5. This draft LCD creates *de novo* coverage decisions for tests, recognizing them as having now met the 'reasonable and necessary' criteria without providing the supporting evidence, the clinical indications or patient selection, or frequency of testing.  It refers to Articles which contain 'reasonable and necessary' decisions.  These should be presented through the LCD process so they are open to public, especially physician input.

Much greater detail is provided in the subsequent text below. With all due respect, we ask that you consider our comments which were prepared by a consortium of members of the Association for Molecular Pathology and Laboratory directors, staff and consultants who provide service to Medicare beneficiaries covered by Palmetto. We are happy to be of assistance in providing additional clinical information, references, contacts, or whatever is needed to assist you with this DLCD. Please direct your correspondence to Dr. Andrea Ferreira-Gonzalez:

Andrea Ferreira-Gonzalez, PhD
Director, Molecular Diagnostics Laboratory
Virginia Commonwealth University/Medical College of Virginia
Richmond, VA
aferreira-gonzalez@mcvh-vcu.edu
(804) 828-9564


Sincerely,


Jennifer L. Hunt, MD, MEd
President

ATTACHMENTS:
Detailed Comments and Concerns

2

AMP Comments                    Palmetto DL33599                    August 29, 2013

The following individuals co-sign this letter:

Robert A. Bray, PhD, D(ABHI), HCLD/CC(ABB)
Director, HLA Laboratory
Sentara Norfolk General Hospital
rab@mlcgroupllc.com

Dongfeng Chen, PhD, D(ABHI)
Director, Clinical Transplantation Immunology Lab
Duke University Medical Center
dongfeng.chen@duke.edu

Michael D. Gautreaux, PhD, D(ABHI)
Director, HLA/Immunogenetics Laboratory
Department of General Surgery
Wake Forest School of Medicine
mgautrea@wakehealth.edu

Howard M. Gebel, PhD, D(ABHI)
Director, Transplant Immunology
Henrico Doctors' Hospital
hgebel@gmail.com

Margaret L. Gulley, MD
Professor
Dept of Pathology
University of North Carolina
margaret_gulley@med.unc.edu

J. Charles Jennette, MD
Chair, Dept of Pathology & Laboratory Medicine
University of North Carolina-Chapel Hill School of
Medicine
charles_jennette@med.unc.edu

Peter J. Kragel, MD
Chair, Dept of Pathology & Laboratory Medicine
Brody School of Medicine/East Carolina University
kragelp@ecu.edu

Peter N. Lalli, PhD, D(ABHI)
Director, Histocompatibility and Flow Cytometry
Laboratory
Carolinas Laboratory Network
peter.lalli@carolinashealthcare.org

Edward H. Lipford, MD
Medical Director
Carolinas Laboratory Network
ned.lipford@carolinashealthcare.org

Gerard J. Oakley, III MD
Assistant Professor of Pathology
Marshall University
joey.oakley.2002@owu.edu

Salvatore V. Pizzo, MD, PhD
Chair, Dept of Pathology & Biochemistry
Duke University School of Medicine
salvatore.pizzo@duke.edu

Lorita M Rebellato, PhD, D (ABHI)
Laboratory Director
Department of Pathology
The Brody School of Medicine at ECU/Vidant Medical
Center
REBELLATOL@ecu.edu

Mary S. Richardson, MD
Interim Chair, Dept of Pathology and Laboratory
Medicine
Director, Surgical Pathology
Medical University of South Carolina
richardm@musc.edu

John Schmitz, PhD
Professor, Pathology & Laboratory Medicine
Director, HLA, Flow Cytometry and Immunology
Laboratories
UNC Hospitals
jschmitz@unch.unc.edu

Karen E. Weck, MD
Professor of Pathology & Laboratory Medicine and
Genetics
Director, Molecular Genetics
University of North Carolina at Chapel Hill
kweck@unc.edu

David S. Wilkinson, MD, PhD
Professor
Director of Molecular Genetic Pathology Fellowship
Associate Director of Transfusion Medicine
Department of Pathology
Virginia Commonwealth University
dwilkinson@mcvh-vcu.edu

3

AMP Detailed Comments and Concerns    Palmetto DL33599                    August 29, 2013

I.    **Withdrawing coverage for molecular pathology testing**
      *Palmetto GBA must review all test/assay clinical information to determine if a test meets
      Medicare's reasonable and necessary requirement. Labs must submit a comprehensive dossier on
      each new test/assay prior to claim submission. Palmetto GBA will only cover and reimburse tests
      that demonstrate analytical and clinical validity, and clinical utility. Prior to this tech assessment
      and published coverage determination, Palmetto will consider all tests investigational and
      therefore, not a covered service. [Under Technology Assessments (TA)]*
      a. Withdrawal of coverage from tests currently being covered
         Molecular pathology tests are currently covered by Palmetto, reported under the old and new
         molecular pathology codes in 2012 and by the new molecular pathology procedures in 2013.  In
         the absence of other LCDs limiting coverage, this means they have been considered to be part of
         the standard of medical practice and to meet the 'reasonable and necessary' criteria for patient
         care.  Therefore, the action proposed in this DLCD represents a withdrawal of existing coverage
         for molecular pathology tests, applied solely to the new CPT codes. This position as part of an
         LCD means that Palmetto will never cover a molecular pathology test for a beneficiary, until a
         new LCD has been issued for the individual test.

         In order to withdraw coverage according to the LCD process as described in the PIM 83 Chapter
         13. Palmetto needs to present the medical evidence which supports its proposed action,
         specifically, the evidence that demonstrates that the medical literature and medical standard of
         practice no longer supports the position that the service is considered to be 'reasonable and
         necessary'; specifically, that the service for which coverage is to be withdrawn is no longer
         considered to be safe and effective, or that it is now considered to be investigational and under
         study, e.g. clinical trials, or that it is no longer appropriate, including in duration and frequency,
         in terms of whether it is furnished in accordance with the accepted standards of medical practice
         for the diagnosis or treatment of a patient's condition, or it is no longer furnished in a setting
         appropriate for the patient's medical needs and condition, or it exceeds the patient's medical
         need or that it no longer is considered to be at least as beneficial as an existing available
         medically appropriate alternative (PIM 83 §13.5.1).  Palmetto must describe how the service no
         longer meets one of these criteria and provide the evidence to support that conclusion.

         In this DLCD, Palmetto is proposing to withdraw coverage for the entire area of molecular
         pathology as a diagnostic service.  To do so, they either need to provide evidence that the entire
         field of testing is no longer safe and effective and appropriate for the diagnosis or treatment of a
         patient's condition, or that it is no longer supported by the medical evidence or medical practice.
         The fact that they will now be reported under new CPT codes is not sufficient reason to declare
         them investigational and withdraw coverage.  Alternatively, Palmetto needs to provide evidence
         for each molecular pathology test.  The evidence should be based on published authoritative
         evidence in clinical trials and general acceptance by the medical community (standard of
         practice), as supported by sound medical evidence. (PIM §13.7.1)

         All this evidence needs to be provided for review and public comment through the LCD process
         before the coverage can be withdrawn.

4

b.  Reason for withdrawal.

There are 2 ways 'investigational' is used with respect to Medicare. The first relates to the restriction on covering 'research' as cited in the statute, referenced in 'clinical trials' or patient outcomes research (Section 1142):

> (D) in the case of clinical care items and services provided with the concurrence of the Secretary and with respect to research and experimentation conducted by, or under contract with, the Medicare Payment Advisory Commission or the Secretary, which are not reasonable and necessary to carry out the purposes of section 1886(e)(6),
>
> (E) in the case of research conducted pursuant to section 1142, which is not reasonable and necessary to carry out the purposes of that section,

The molecular tests addressed in this DLCD and currently covered by Medicare would not be considered to be research as defined in these 2 statements in the statute.  They have been performed as part of the practice of medicine in general. They are not being performed as part of a research or clinical study. Therefore, they would not be excluded as 'research'.

The second use of "investigational or experimental" refers to the lack of sufficient medical evidence to support it as 'reasonable and necessary' under §1862(a) (1)(A). This means that the medical evidence is not present to support the position that the service or item is recognized by the medical community as part of the standard of practice or it has not been demonstrated through clinical evidence that the service or item  is 'safe and effective'. If Palmetto is making this determination based on this second use of the term 'investigational', then this is a change in its current position of covering these tests. As noted above, in order to change that position and no longer cover them, Palmetto needs to provide the evidence that supports this new position that the medical evidence is no longer sufficient to consider the use of the test as part of the standard of medical practice, as safe and effective. The proof would need to be provided for each of the tests for which coverage is being withdrawn. It should be included in the Draft Local Coverage Determination in which they propose to withdraw the coverage in order for the public, especially the medical community to review and provide comment.

Palmetto has not cited any evidence in DL33599 to support its position that all tests are now investigational. There is no evidence provided in DL33599 which demonstrates any of the following:

- that the area of molecular pathology is no longer a part of the standard of practice and is considered 'investigational' field by the medical community or that as a whole they are not safe and not effective for diagnosis or treatment decisions,
- that any of the tests affected by this policy are no longer safe and effective or
- that the medical evidence now indicates each of these tests is no longer recognized as part of the standard of practice for the conditions or indications they would be used or
- that the medical community/medical literature for each of the tests now considers the test to be 'investigational'.

c.  Withdrawal of coverage defined by the national coverage determination.

Medicare issued a National Coverage Determination (NCD 190.3) which states that Medicare covers cytogenetic testing when it is reasonable and necessary and then lists the conditions for which it is covered.  It leaves it to the contractors to make local coverage decisions about coverage for other conditions.  Palmetto cannot withdraw coverage for tests for conditions listed

5

AMP Detailed Comments and Concerns    Palmetto DL33599                    August 29, 2013

in the LCD:  genetic testing done, *in utero,* failure of sexual development, chronic myelogenous leukemia, acute leukemias lymphoid, myeloid and unclassified or myelodysplasia.

## REQUEST:

1) Palmetto continue to cover molecular pathology tests until such time that it either
   a. Provides evidence to support the position that the entire field of molecular pathology is no longer considered part of medical practice, that the medical community no longer considers it part of the standard of practice, that the medical evidence no longer supports the position that it is safe and effective for which coverage withdrawal is proposed; or
   b. Provides medical evidence for each molecular pathology test impacted by this DLCD, that the test is no longer safe, effective or recognized as part of the standard of practice for the condition or indications for which it is use.
2) Palmetto should present the medical evidence to support its position in the LCD process.
   a. The position and evidence should go through the LCD process for each of the tests for which coverage withdrawal is proposed; and
   b. Palmetto should provide the medical evidence that indicates a test is no longer safe, effective or recognized as part of the standard of practice for the condition or indications for which it is used and/or is considered 'investigational' by the medical community/medical literature; and
   c. This allows for the required LCD Comment Period.
3) Palmetto retract its position that all molecular pathology tests will not be covered because they are 'investigational', that their safety/effectiveness is no longer supported, until it has presented evidence for public comment that supports this position to allow the medical community to challenge the position and the evidence upon which it is based.
4) Palmetto continue to cover testing for conditions identified in the NCD 190.3.

---

II. **Lack of coverage and/or payment while the technical assessment is performed - Implications for beneficiary access and laboratories.**

This is a drastic withdrawal of coverage which would stop payment for all tests until a technical assessment can be performed for each test. The time required for Palmetto to complete the process of reviewing the evidence for every test and then presenting their findings through the LCD process is considerable. This delay has serious access and survival implications for the beneficiaries and the laboratories.  It could have serious long term could impact access by Medicare beneficiaries to relevant medical care.

Even with adequate staffing and resources, this process would take months into years to accomplish.  When CDC considered performing such a review for genetic testing, they concluded the benefits did not outweigh the size of the task and cost. We have serious concerns about the resources available to Palmetto to carry out this volume of work in a timely fashion, to have minimal impact on access to services. Historically, review of one test approved in Jurisdiction 1 took 7 months to return a positive decision. Even though coverage was retroactive, this could impact patient's care and be incompatible for a lab dependent on running these types of test.

If such a drastic withdrawal of coverage and institution of a new process for the entire subset of pathology services is to occur, Palmetto needs adequate time to prepare to implement such a wide sweeping program so that there is the least disruption to providers and patient access to

6

services. Likewise, the laboratory community needs adequate time to prepare for these new rules – to prepare for the sudden loss of coverage and to prepare the necessary medical evidence for review. The customary Notice Period of 45 calendar days is inadequate for labs to prepare the necessary documents and for Palmetto to perform the reviews of all tests by all labs to ensure least disruption of service.

Historically, when CMS has implemented programs with such drastic implications on providers and patient access to services, they have put the implementation date months into the future to allow CMS and providers time to do the necessary work to allow for a smooth transition without drastic negative consequences.

**Retroactive coverage:** while we appreciate retroactive coverage, there are logistical problems with it. It is being assumed that the claim can be resubmitted for payment. Whether that can be done depends on the denial reasons, whether there can be a resubmission or an appeal is required. Both avenues represent significant burden on the providers as well as the patients.

**REQUEST:**
1) If withdrawal of coverage is supported, when selecting an effective date, Palmetto consider the impact on the providers and beneficiaries as well as its own resources and ability to perform the necessary tasks within the defined time period, so that the implementation will have the least negative impact on access to services for the beneficiary.
2) Please clarify the reason for denial for claims submitted before a unique identifier has been obtained to ensure resubmission is possible for retroactive coverage decisions.

---

### III.  Content of an LCD and Associated Articles

We note that the DL33599 addresses both local coverage determinations related to 'reasonable and necessary' criteria and the coding guidelines for these tests. As referenced in PIM §13.1.3, LCDs should contain only "reasonable and necessary" information, with CPT and ICD-9 codes included only when they are relevant to or clarify the items intended to be covered (or not covered).   All MAC decisions to about coverage status, specifically whether a service is considered to meet 'reasonable and necessary' and will (or will not) be covered should be addressed in the LCD and go through the draft LCD process citing the supporting medical evidence and have the Notice and Comment period to allow review input by the public, especially the medical community about the service and criteria being proposed.

This is in contrast to the Article format, which is associated with an LCD and provides additional educational information about the LCD and the coding guidelines. The coding guidelines could include definitions of codes, lists of items that may be billed under a particular code and minimum requirements that providers must meet in order to bill using a certain code. It could also include a product classification list that would inform providers about which specific products meet the definitional requirements of a specific code.

As specifically noted in the PIM §13.1.3 ¶6, coding guidelines should not be included in the LCD because of the implications under the 522 provision of BIPA that may lead to confusion. In the future, announcing the unique identifier number for a lab test would be the subject matter for an article and not the LCD.

AMP Detailed Comments and Concerns    Palmetto DL33599    August 29, 2013

**REQUEST:**
Please separate local coverage determinations related to 'reasonable and necessary' criteria for molecular diagnostic tests for specific conditions and their use for diagnosis and testing, addressed as LCDs and published on the Medicare Coverage Database (MCD) from content related to coding guidance, which should be addressed in Articles, also published in the MCD.

Please refrain from issuing coverage decisions as Articles; they should be presented as draft LCDs, as described in the PIM.

For decisions already presented as Articles, please redraft them and submit them for public review and comment through the LCD process.

---

**IV.  Coverage indications, limitations and medical necessity**

*Coverage Indications, Limitations and/or Medical Necessity*
*As per Pub 100-08 PIM, Ch. 13, Sec 13.1.3, tests not covered due to benefit category or statutory exclusion provisions will not be listed in this LCD.*

We have no disagreement with this statement as it is presented. Medicare instructions are clear on this matter.  However, we disagree with Palmetto's conclusion that the reasons for not covering the bulleted items are either lack of benefit category or statutory exclusion. The reason for a denial is important for two reasons:  for the beneficiary in terms of liability for payment and notification of coverage/denials and for the medical community in terms of obligation to present decision about coverage through the LCD process. Therefore, we will address this issue in more detail.

In PIM 100-8, §3.6.2.5, Medicare provides a step-wise approach to deciding whether a service or item could be covered. Using that approach, we believe there is a benefit category and that molecular tests are NOT excluded by the statute. The primary reasons for denial for the situations cited would be 'reasonable and necessary criteria'. Therefore, they should be addressed within an LCD.

Step 1: Benefit Category: It is our interpretation that there is a benefit category for molecular pathology:
- The first benefit listed for Part B is medical and other health services §1832(a)(1); it specifies physicians services §1832(a)(B)(I).
- "Medical and other health services" are defined in §1861(s); they include physician services (q) and diagnostic services (§1861(s)(2)(C).
- There are no restrictions in these sections that would apply to molecular pathology tests.
Therefore, as services provided by physicians and as a subset of diagnostic services, there is a benefit category for molecular pathology procedures.

Step 2: Statutory Exclusion:
If there is a benefit category, then the next reason for noncoverage is if "the service/item is statutorily excluded by other than §1862(a)(1) of the Act;" (PIM 100-8, §3.6.2.5).

The critical language is "other than §1862(a)(1) of the Act". The statutory exclusions that would be 'other than' are identified in §1862(a)(2) through (25). They include things like personal comfort items,

8

cosmetic surgery, dental care, eye exams for eye glasses or contacts, hearing aids, routine dental services, and services resulting from acts of war. The full list of items which are excluded by statute is referenced again in (CLM 104 chapter 30 Financial Liability Protections §20.2 Denials for which the limitation on liability provision does not apply) and in §20.2.1 Categorical Denials.

Molecular pathology is NOT one of the items specifically cited as excluded by the statute in [§1862(a)(2) through (25)]. Therefore, coverage would not be denied because of statutory exclusion.

Step 3: "reasonable and necessary' criteria: If there is a benefit category and there is not a statutory exclusion that applies, the remaining issue for coverage and denial of payment is whether the 'reasonable and necessary' criteria have been fulfilled. These are defined in §1862(a)(1).

**CONCLUSION:** There is a benefit category and  molecular pathology testing is not cited in the statutory exclusions <u>other than</u> §1862(a)(1) of the Act, therefore, the reason for denial would be based on 'reasonable and necessary criteria', which includes §1862(a)(1)(A).  Therefore, the coverage limitations for these types of denials are the subject of LCDs.

**REQUEST:**  Refer to these as situations which do not meet 'reasonable and necessary' criteria.  Continue to address them through the LCD process, as per PIM Chapter 13.

**<u>Specific exclusions listed in DL33599 that require clarification.</u>**
*Testing the asymptomatic person* (Bullet points 1 and 4)
Because the person does not have symptoms for which diagnosis is needed, this would be considered screening whether it is testing for the presence of a genetic condition or for the person's risk for developing a disease or condition in the future. Neither use would meet §1862(a)(1)(A). The reason for denial would be 'not reasonable and necessary'.

*Tests that do not provide the clinician with actionable data (information that will improve patient outcomes and/or change physician care and treatment of the patient):*
We would caution Palmetto about a too narrow a view of the purpose of doing diagnostic tests and their application to molecular diagnostics. We understand that use of testing must be medically necessary and appropriate for the patient and condition.

However, we would like to emphasize that molecular pathology testing should be held to the same standard, and not a more rigorous or limited one, than other diagnostic tests covered like chest x-rays, CT, MRIs, PET scans, EKG, or other blood tests when used to confirm diagnoses made based on clinical signs and symptoms. For example, pneumonia can be diagnosed by clinical findings but we do a CXR to confirm it. Likewise, a fracture can often be diagnosed by clinical history and exam but we x-ray to confirm the diagnosis. Clinical guidelines can address the clinical history and findings but also the diagnostic studies considered appropriate to confirm the clinical diagnosis.

In general diagnostic testing is done for a number of reasons – and should have benefit to the patient and the physician. As an insurer, the physician services are being covered on behalf of or for the beneficiary.

> "If a test has utility, it means that the results—positive or negative—provide information that is of value to the person being tested because he or she can use that information to seek an effective treatment or preventive strategy. Even if no interventions are available to treat or prevent disease, there may be benefits associated with knowledge of a result." Secretary's Advisory Committee on Genetic Testing, Enhancing the Oversight of Genetic Tests, June 2000.

> The "question of whether the information provided is significant and meaningful enough in a health care context" should consider its significance and meaning to both the patient and physician. (DHHS SACGHS Coverage Reimbursement 2006)

Reasons for performing tests:
- The first is to confirm a clinical diagnosis.
- Directing other tests to obtain a diagnosis – ruling out some causes, redirecting to others
- To provide additional information about the physiologic/structural conditions associated with the signs/symptoms and provide additional guidance on the cause.
- To identify options for
  o curative intervention: drug choices/response; Surgical or invasive interventions
  o symptomatic management – physical and mental/emotional
- Identification of associated comorbidities to be assessed and/or monitored.

A test which has impact on the patient and their medical decision-making does have an impact on the physician plan of care and the options to be considered for treatment.

*Tests without diagnosis specific indications*
> We are not sure to what this is referring. We would ask that Palmetto provide additional guidance or explanation of what type of testing this is so that we can understand its meaning and abide by its guidance.

*Tests performed to measure the quality of a process or for Quality Control/Quality Assurance (QC/QA), i.e., tests performed to ensure a tissue specimen matches the patient*
> We understand that tests performed as part of the Quality Control or Quality Assurance process as part of CLIA and certification would not be covered.  They are not specific to a patient.

> However, instances in which assay targets are included in the procedure which are necessary for normalization of the results should not be considered quality control as they are an integral part of the assay necessary for interpretation of the results for that patient.

*Tests considered investigational or experimental*
> Please see detailed discussion of this above. We accept that tests performed within the context of a clinical study are not covered by Medicare unless they qualify as one of the exceptions in the NCD on Clinical Trials (NCD 310.1).  However, there is a distinction between clinical studies and services and items for which the safety and effectiveness has not been sufficiently established in the medical literature and medical standard of practice for purposes of coverage.

10

AMP Detailed Comments and Concerns    Palmetto DL33599                          August 29, 2013

**REQUEST:**
1. Revise the statement to indicate that the LCDs <u>do</u> address reasonable and necessary coverage determinations.
2. Revise the statement to indicate that the items cited in the bulleted list are not covered because they do not meet 'reasonable and necessary' criteria. They are appropriately addressed in the LCD. The waiver of liability responsibilities apply.

---

**V.  *Coverage for conditions and indications associated with the approved tests***
*Covered Tests: To date, Palmetto GBA has reviewed the MolDx application and/or the MolDx Technical Assessment and determined the following tests meet the Medicare reasonable and necessary criteria:*

As stated in the LCD, the review of the tests cited has included a review of the clinical utility of these tests and that Palmetto found there to be sufficient medical evidence to support the 'reasonable and necessary' criteria for covering the tests. Because these are new decisions to cover tests under the reasonable and necessary criteria, they are subject to the LCD process for presentation and public comment before final implementation of coverage. The LCDs would include identification of the tests to be covered by CPT code or gene tested, the clinical indications, the patient selection limitations, the frequency of testing, the ICD-9 codes and reporting CPT codes, and presentation of the medical literature that Palmetto considered in making this positive determination.

We have not been able to identify any LCDs in the Medicare Database for Palmetto Jurisdiction 11 for these 14 tests to indicate they have gone through the LCD process prior to being presented in this DLCD. We have identified Articles for 7 of them which include the clinical diagnosis or symptoms for which they will be covered.

Because there are no existing LCDs on the tests addressed this draft LCD, their presentation here is a *de novo* local coverage determination for the tests including the individual analytes performed as part of a test that is included in the panel/composite or group. There are no details provided which should be included, e.g. conditions covered, diagnosis codes, patient selection, frequency of testing etc..

**Specific Concerns:**
- We are especially concerned about the lack of details identifying the appropriate patient population, indications, and frequency of testing considered necessary for all of the tests but especially for the Corus CAD and Vectra CA tests.
- It is not clear which therascreen test is referred to in this DLCD. There are a number of tests by therascreen: KRAS, EGFR, and BRAF.

**REQUEST:**
1) Provide the necessary information for each test listed here which is being presented as having met the 'reasonable and necessary' criteria, to include indications, diagnosis, patient selection, and frequency for the tests under review that would be the basis of coverage decisions.
2) Provide the medical evidence for each test that supports the criteria and a positive decision for coverage.
3) Provide the information as part of a DLCD for public review and comment.

11

AMP Detailed Comments and Concerns    Palmetto DL33599                                       August 29, 2013

---

### VI. Coverage of multiple-assay tests with an algorithmic component

*A MDT may consist of a single mutation analysis/identification, and/or may or may not rely upon an algorithm or other form of data evaluation/derivation.*

a.  **Clarification**

We support the position that molecular diagnostic tests and tests that include an algorithmic component should be subject to the LCD process. However, we would like clarification of this statement.

    i.   A molecular diagnostic test generally does not rely upon an algorithm or other form of data evaluation or derivation. They report qualitative or quantitative data about the specimen tested.

    ii.   The tests that do include an algorithm or use of other data evaluation have been assigned a separate CPT code set: either an "administrative multiple-assay tests with an algorithmic component (MAAA)" or a category 1 code if the test met those criteria

Molecular diagnostics tests are only one of the types of pathology tests which can be included within an MAAA test. They may also include fluorescence *in situ* hybridization assays and non-nucleic acid based assays (e.g., proteins, polypeptides, lipids, carbohydrates). In the AMA CPT Code text, it states that an algorithmic analysis is performed using the results of the assays, using the results of these assays as well as other patient information (if used) and reported "typically as a numeric score(s) or as a probability."

As stated in the AMA CPT book, the MAAAs are typically unique to a single clinical laboratory or manufacturer. The results of individual component procedure(s) that are inputs to the MAAAs may be provided on the associated laboratory report, however these assays are not reported separately using additional codes.

    iii.   The list of CPT codes to which this policy is applied does not include the CPT codes that contain the algorithm component: CPT Codes 81500 – 81512, plus 81599

b.  **Our concerns about Palmetto's decision to cover these tests using NOC codes**

We do not support Palmetto's actions to cover these tests by assigning them an NOC code, especially one outside the appropriate section of the CPT manual. They should be reported under CPT Code 81599. Any use of the NOC code should be temporary, until a unique code has been obtained.

We believe it is important for tests to go through the AMA CPT process because it provides a level of review by physicians with expertise in the area. The code applications are reviewed by medical and technical experts via several mechanisms starting with the Molecular Pathology Advisory Group, followed by the Pathology Coding Caucus and finally by the AMA CPT Editorial Panel. This process provides multiple layers of review by physicians to determine if the test is clinically relevant and appropriately supported by medical evidence

c.  **Palmettos' decision to cover these tests and the implications for patient and laboratory liability and future audits.**

12

AMP Detailed Comments and Concerns    Palmetto DL33599                    August 29, 2013

We believe the MAAA tests are unique tests which provide unique information and serve a distinct clinical benefit and should be covered by Medicare, however, we have 2 concerns about coverage proposed by Palmetto.

    i.  Local Coverage and Payment policy in <u>conflict</u> with the CMS national position.
CMS has presented its position on these types of tests. CMS issued a final decision that it does not recognize the new MAAA codes as valid for Medicare purposes under the CLFS for CY 2013. They have instructed laboratories to continue to use the existing HCPCS codes. <u>New and Reconsidered Clinical Laboratory Fee Schedule (CLFS) Test Codes and Final Payment Determinations</u> dated 11/05/2012. The transmittal 2639 states "Additionally, there were 9 new HCPCS codes for multi-analyte assays with algorithmic analyses (i.e., 81500 through 81512, and 81599) in 2013. The testing described by these codes is subject to the CLIA regulations; however, they are not payable by Medicare for CY 2013. Hence, these 9 codes were not included in this Change Request." (Transmittal 2639 January 25, 2013, MM8162.)

We believe that it is the intention of CMS to not cover any tests with an algorithmic component which would meet the description of the MAAA codes regardless of whether it has received a specific MAAA code assignment or not.

We are concerned about the implications of the impact on beneficiaries and risk of future audits of laboratories for payment received for tests that CMS has indicated at a national level are not payable by Medicare.

Furthermore, if a claim is to be submitted, to avoid future suspicion of fraudulent claims submission for a test which was known not to be covered, it should be submitted using the AMA CPT Codes for MAAA tests or, in the absence of a specific MAAA code, using CPT code 81599, Unlisted multianalyte assay with algorithmic analysis. They would receive a denial.

   ii.  **Differential treatment of these tests relative to the withdrawal of coverage for all other molecular diagnostic tests.**
These are usually individual proprietary assays and the fact that they negotiate with the MAC to be covered under an unrelated NOC code without going through the LCD coverage process and review and then negotiate payment outside the Clinical Lab Fee Schedule process does not appear to be appropriate especially when you consider that those MAAA tests that have gone through the CPT process to obtain an official CPT code are NOT paid by Medicare in the other jurisdictions and in light of the proposed withdrawal of coverage for all other individual molecular pathology tests. The coverage and price should not be determined in a black box at the local level; this is inappropriate for a national program.

Therefore, we believe all MAAA tests that meet the description of an MAAA, should be reported using the existing codes as instructed by CMS, including using the NOC code for this set of CPT codes to report those MAAA tests which do have not been assigned a specific CPT code.

13

AMP Detailed Comments and Concerns    Palmetto DL33599                    August 29, 2013

**REQUEST:** We request that Palmetto
1) Stop recognizing, assigning identifiers and issuing positive statements about payment for multianalyte assays with algorithmic analysis (MAAA), to be consistent with the CMS instructions on these tests. Require the individual tests performed be reported using existing CPT codes, as per CMS instructions.
2) Require that the individual tests performed in the MAAA be reported under the CPT Code for MAAA tests, including the use of 81599 for those tests which have not been assigned a specific CPT code.
3) Refrain from including the algorithmic component of the test in determining the payment for molecular pathology tests until such time as CMS has had the opportunity to obtain more information and makes a different decision that allows the algorithm to be included for payment.

_____

**VII. Coding Guidelines – Unique Identifier**
In public discussions, a number of reasons have been offered by Palmetto for the creation of the Unique Identifier system.

**a. Difficulty identifying what tests have been done from the claim form**
We understand the need in some cases to match a lab test with a specific CPT code. We understand the challenges with the old CPT codes but the new CPT codes are very specific for what is being tested. The analyte is in the name of the code. For Tier 2 codes, they have been grouped by Level to include those tests that represent similar level of complexity and resources for testing. The specific analytes are listed and can be reported on the claim form in the same area which would be used to report the unique identifier.

The new codes have not been implemented long enough to demonstrate that there continues to be confusion about what is being billed under the CPT code. Therefore, we question the need for a system that assigns a unique identifier for each test performed by a lab, whether it is an FDA-approved (IVD) assay or LDT which includes the modified FDA-test.

**b. Need to verify analytic/clinical validity of tests performed, other than for FDA-approved tests.**
We disagree with the position that a separate review of the analytic validity of each LDT or modified IVD by the local contractor is needed. In order to be reimbursed by Medicare, the laboratory must be CLIA certified. CMS has already certified the laboratory (and all the tests it performs) under the CLIA program which sets a standard for quality control for all tests performed. In its brochure on CLIA, it notes that Medicare requires that laboratories performing tests be CLIA certified. It states CLIA "established quality standards for laboratories to ensure the accuracy, reliability and timeliness of patient test results regardless of where the test is performed." This certification applies to all tests performed; including laboratory developed tests and modified FDA tests. By law, laboratories conducting moderate and/or high complexity testing are required to participate in Proficiency Testing for certain tests they perform. Requiring that an additional review above and beyond the CLIA certification for Medicare payment of CLIA tests is inappropriate. In addition, information about validity can be found on the NIH Genetic Testing Registry.

We believe the CLIA certification is sufficient for analytical and clinical validity. If a lab is not CLIA certified, the test cannot be paid for by Medicare. That should be sufficient to obtain a unique identifier for a test, if one is needed. In addition, for new tests, the CPT application process includes a review of the analytic and clinical validity evidence to determine whether it is sufficient to support its position as part of medical practice. We question the authority and

14

expertise of the MAC through a local contractor process to override the CLIA certification process, a national CMS determination.

**c. Need to be sure claims are not being paid for tests done on asymptomatic persons, e.g. to determine carrier status.**
We understand this as an issue. However, the unique identifier will not be sufficient to address this problem when a test can be performed for many medical reasons in the symptomatic person as well.

It may be possible to address this with specific information in the LCD, accompanying education articles and requiring that the appropriate HCPCS modifier be applied to the CPT Code.

> GA - Waiver of liability statement on file. (The physician expects Medicare deny a service as not reasonable and necessary and they do have an ABN signed by the beneficiary)
>
> GZ - Item or service expected to be denied as not reasonable and necessary. (The physician expects Medicare deny a service as not reasonable and necessary and they do NOT have an ABN signed by the beneficiary)

**d. Performing 3 or more tests creates a "new test" that should be reviewed for medical necessity**
There are 2 different ways this can present in clinical practice.

Individual tests done in sequence or combination, reported separately.  We are in agreement that every test ordered must be for the diagnosis or treatment for a symptomatic patient. However, there is a difference between a lab creating a 'panel' of tests for a condition, which are identified on an ordering form to assist in ordering tests. The form must be clear so that physicians understand which tests are being included in the panel and each test must be clinically necessary. It can also be stated that if the tests are to done in sequence, the order of testing to be determined by the results from a previous test. This is common practice for example with cultures for infectious disease. There is a way for the physician to order the a fluid specimen for gram stain, then culture and further testing for sensitivity is only performed based on the previous results.  Each step in the testing is clinically indicated.  Being able to indicate that the intention of the physician is to have the full sequence done if the first test is positive. This allows the lab to proceed without requiring a delay imposed by informing the physician of the first result and requiring a new order to proceed, or even requiring a new specimen.  The results of each of the tests is independent and reported.

Tests ordered as a 'panel' because they are related, done in sequence and each clinically indicated to not constitute a 'new test' that must be reviewed to determine if it meets 'reasonable and necessary' criteria.

A single test composed of individual tests with a new composite result. This is very different from the new testing capabilities in which multiple tests can be performed and their results combined and analyzed with an algorithm to create a new and different result which is the only thing reported, e.g. a risk score.  We agree this type of combining tests  where the report from the whole panel is different information and should be addressed as a new and different test distinctly different and separate from the individual component tests.  The MAAA tests are an example of this type of new testing.   It is appropriate to review the combined test result/report to determine if it meets 'reasonable and necessary' criteria.

15

AMP Detailed Comments and Concerns    Palmetto DL33599                    August 29, 2013

e.  **Need to address clinical utility of a test**
The unique identifier process should not include clinical utility. This is essentially an evaluation of the medical literature and a decision as to whether a test meets the 'reasonable and necessary' criteria for a specific condition. This should not be done by an outside organization. As per the PIM Chapter 13, it should go through the LCD process, which requires presentation of the medical evidence and Palmetto's conclusions and is open to review by the medical community for public comment.

**REQUEST:**   We request that Palmetto
1.  Recognize the CMS administered CLIA program as sufficient to ensure the accuracy, reliability and timeliness of patient test results.
2.  Limit the unique identifier system to those tests for which a specific CPT code has not been assigned. This should be reviewed on an annual basis. When a specific code is assigned, the identifier should no longer be required.
3.  Consider including information in the LCD about testing in asymptomatic persons, the reasons for denial and use of a modifier for claims submission. Publish an accompanying article to reinforce appropriate billing using the modifiers.
4.  Separate the clinical utility of a test for a condition from the unique identifier system. As a decision about whether the test is considered to meet 'reasonable and necessary' criteria for coverage purposes, clinical utility should be addressed within the already defined and required LCD process.

---

**VIII.    Status of FDA approved tests: Applicable Tests/Assays**
In reviewing this DLCD from the perspective of claims submission, there is one major area that has not been addressed, that is its application to FDA-approved tests.

**REQUEST**: Please address the following questions:
- Would existing coverage determinations (LCDs) apply to FDA approved tests?
- Are FDA approved tests recognized for their approved indications?
- Does the Unique Identifier program apply to FDA-approved tests? Will there be an Article accompanying this LCD with information for billing? How should a laboratory indicate on the claim that a test being billed under a specific code is done with an FDA-approved test and not one that requires a unique identifier as defined in this LCD?

---

**Exhibit D:**
**February 24, 2014 Letter from California Clinical Laboratory Association to Palmetto GBA**

Plaintiffs' Complaint,
*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*



**CALIFORNIA
CLINICAL
LABORATORY
ASSOCIATION**

1127 Eleventh Street, Suite 820   •   Sacramento, CA 95814   •   (916) 446-2646

February 24th, 2014

Elaine Jeter, M.D.
Medical Director, Palmetto GBA
PO Box 100190
Columbia, SC 29202

Subject: Draft Palmetto LCD DL34499 -- Coverage Indications, Limitations, and/or Medical Necessity
Proposed policy to limit or non-cover genetic testing based on clinical utility for: CPT 81225 (CYP2C19), CPT 81226 (CYP2D6), CPT 81227 (CYP2C9), and CPT 81355 (VKORC1)

Dear Dr. Jeter:

I write on behalf of the California Clinical Laboratory Association and the Medicare patients served by genetic testing laboratories in California and throughout the nation. Your immediate intervention is needed in connection with a draft LCD DL34499.

If LCD DL34499 is allowed to become operational, it will significantly adversely affect Medicare patients. The concept that "clinical utility" must be shown before a test is paid for by the Medicare program is an appropriate threshold question. However, in this instance the clinical utility criterion is being subverted. **The clinical utility has been well-established for the tests which LCD DL34499 would make unavailable to Medicare beneficiaries.** The clear and convincing evidence of the clinical utility of these tests is not being recognized by Palmetto DBA. In addition, the process being utilized by Palmetto DBA has not allowed for appropriate participation by the scientists and clinicians who are well-versed in these test procedures.

The diagnostic tests which are the subject of LCD DL34499 have been demonstrated to improve patient outcomes by providing information that is used to identify patients who will benefit from helpful downstream management actions -- such as effective treatment in individuals with

positive test results and no treatment for those with negative results. **These tests clearly have clinical utility and will save the Medicare program scarce resources by allowing for better medical management of patients.**

Pharmacogenetic (PGx) testing is a tool that serves to provide information about the pharmacokinetics (PK) and pharmacodynamics (PD) of certain drugs in an individual patient due to variations in genetic makeup. PGx provides valuable information in making decisions about therapeutic alternatives for a patient. The FDA has stated that genetic differences between individuals can affect virtually all aspects of a disease and its treatment and that, among the genetic differences of most relevance in drug development, are those associated with genes involved in a drug's PK and ADME (absorption, distribution, metabolism, and excretion).

Patients benefit from having these tests available

There are Medicare patients for whom a multitude of genetic factors indicate that a drug should be avoided. For these patients, it would be difficult to justify ignoring all of these indications in deciding for or against the implementation of that particular therapeutic. The patients benefit greatly when their treating clinician has this important information to help in making decisions regarding the management of the patient. The alternative is for the clinician to proceed blindly and guess on the most appropriate therapy based on patient response. Either the patient fails to respond to the therapy or responds negatively. This approach cannot be the better alternative. However, the reimbursement guidelines included as part of LCD DL34499 will drive the practice of medicine in this direction.

Elimination of these tests will result in higher costs for the Medicare program

Limiting CMS expenditure on molecular diagnostic testing is the antithesis of what should be done to better manage the total healthcare dollars spent by CMS. Prescription drug costs to the healthcare system exceeded $250 billion in 2013. Over the next four years, Medicare is projected to spend over $1 trillion dollars in aggregate on prescription medications alone. PGx testing costs represent a very small amount compared to drug prescription costs, not to mention the costs associated with treatment of adverse events (exceeding $100 billion) resulting from taking the wrong drug. Ironically, PGx is one of the few tools available to predict an adverse drug response

and to minimize the costs associated with an over-prescribed patient population. There are countless Medicare patients who are taking multiple anti-depressant and pain medications that are being poorly metabolized. **More testing will allow the clinicians managing these patients to eliminate the drugs which are less useful to the patient and provide a better outcome for the patient and lower costs for the Medicare program.**

We are aware that other commentators have provided specific details on peer-reviewed studies which confirm the points we are making about the important clinical need and role for these tests and the fact that their availability will result in savings for the Medicare program. [See, for example, the comment letter re LCD DL34499 submitted by the Association of Molecular Pathology.]

In summary, PGx testing can reduce overall healthcare costs by in some instances lowering the number of medications taken by a patient, reducing healthcare visits, quickly identifying the most effective medical regimen, and minimizing the risk for adverse events.

We ask you to please reconsider draft LCD DL34499 in light of the need for PGx testing to assist clinicians in managing their Medicare patients and to assist the Medicare program by saving costs. **Genetic testing is superior to trial and error methods for determining which drugs will benefit Medicare patients.**

Sincerely,

Michael J. Arnold

Executive Director, California Clinical Laboratory Association

CC: Marilyn B. Tavenner, CMS
    CCLA Members and Associates

**Exhibit E:**
**February 24, 2014 Letter from Laboratory of Personalized Health to Palmetto GBA**

Plaintiffs' Complaint,
*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*

**LABORATORY OF PERSONALIZED HEALTH**

**CLIA ID: 07D1036625**
**CT License: CL-0644**
**NY Permit: PFI 8648**
**RI License: LCO-00591**
**CA License: COS 00800405**
**FL License: 800026696**

**NPI: 1336325497**

**LABORATORY OF PERSONALIZED HEALTH**
*Division of Genomas Inc.*
**67 Jefferson Street · Hartford CT  06106**
**Tel: (860) 545-4589 · Fax: (860) 545-4598**
**E-mail:  *LPH@genomas.net***
**Website: *www.genomas.com/LPH***

24 February 2014

**Elaine Jeter, M.D.**
Palmetto GBA
PO Box 100190
Columbia, SC 29202
*J11B.policy@PalmettoGBA.com*

> RE: **Draft Local Coverage Determination: CYP2C19, CYP2D6, CYP2C9, and VKORC1**
> **Genetic Testing** *(DL34499)*

Dear Dr Jeter:

Thank you for the opportunity to comment on *DL34499*.

The **Genomas Laboratory of Personalized Health** *(LPH)* was one of the first pharmacogenetic clinical services in the country. I personally was one of the pioneers of personalized medicine, as researcher and biomedical innovator for 25 years. Nearly 500 mental health and primary care clinicians in Connecticut and New York have utilized *CYP2C19, CYP2D6, CYP2C9* pharmacogenetic diagnostic tests to assess innate drug metabolism capacity for 5,000 patients referred to LPH since 2007. The tests have being employed for benchmarking the innate functional capacity of patients to metabolize neuro-psychiatric and cardio-metabolic medications. LPH is licensed and credentialed by the Centers for Medicare and Medicaid and by the Departments of Health of the States of Connecticut, New York, Florida, California, and Rhode Island.

**LPH is committed to supporting *coverage policies* with evidence and clinical necessity.**
The Genomas *Laboratory of Personalized Health (LPH)* was one of the first pharmacogenetic clinical services in the country. I personally was one of the pioneers of personalized medicine, as researcher and biomedical innovator for 25 years. Nearly 500 mental health and primary care clinicians in Connecticut have utilized *CYP2C19, CYP2D6, CYP2C9* pharmacogenetic diagnostic tests to assess innate drug metabolism capacity for 5,000 patients referred to LPH since 2007. The tests have being employed for benchmarking the innate functional capacity of patients to metabolize neuro-psychiatric and cardio-metabolic medications. LPH is licensed and credentialed by the Centers for Medicare and Medicaid and by the Departments of Health of the States of Connecticut, New York, Florida, California, and Rhode Island.

LPH has contributed data, costing analysis, protocols, perspective and expertise to Association for Molecular Pathology, National Government Services, Palmetto, Noridian, Centers for Medicare and Medicaid, and the Connecticut Congressional delegation (Senators Blumenthal, Murphy and Congressman Larson) for the *gap-fill and coverage* process. We stand ready to provide further information and perspective to all stakeholders in this critical process for the healthcare of all patients across the United States.

Medicare patients have great medical needs that their devoted providers can only address with personalized, gene-guided medicine. Stopping now the coverage of these 3 fundamental tests is a retrograde step for personalized medicine that our patients and providers are deeply resenting. A non-coverage policy is damaging also to the ethic and reputation of Medicare.

1



**LABORATORY OF PERSONALIZED HEALTH**

NPI: 1336325497

CLIA ID: 07D1036625
CT License: CL-0644
NY Permit: PFI 8648
RI License: LCO-00591
CA License: COS 00800405
FL License: 800026696

**LABORATORY OF PERSONALIZED HEALTH**
*Division of Genomas Inc.*
67 Jefferson Street · Hartford CT 06106
Tel: (860) 545-4589 · Fax: (860) 545-4598
E-mail: *LPH@genomas.net*
Website: *www.genomas.com/LPH*

**Why coverage of CYP450 Testing (CPT 81225, 81226, 81227) matters to Medicare patients.**

  A. Medicare population by definition is older, frail, and vulnerable. Most Medicare patients are on *poly-pharmacy* (multi-drug regimens) and at high risk of adverse drug interactions. They need local service, to be covered at no financial risk.
  B. Patients in your jurisdiction will be deprived of access to the tests.
  C. Medicare coverage is a national public health issue. Local non-coverage produces healthcare disparities.
  D. The tests CPT 81225, 81226, 81227 are complex and specialized. LPH is a national leader in the performance and clinical interpretation of the tests, in order to improve medication outcomes.
  E. Local providers serve their communities better. Local non-coverage determinations prevent them from advancing the standard of care.

***CYP2C19, CYP2D6, CYP2C9* gene tests are used for patients with drug intolerance or resistance.**
Clinicians do not prescribe these tests for screening purposes. CPT 81225, 81226, 81227 tests are prescribed to diagnose innate drug metabolism alterations that are causing drug intolerance or drug resistance. The work-up of innate drug metabolism capacity is essential to benchmark the functional status of patients and determine their suitability for pharmaco-therapeutics. Clinicians have incorporated these pharmacogenetic diagnostics to assist them in managing patients who are refractory to drug treatments and developmentally vulnerable (such as Alzheimer's disease). Uniformly, clinicians, patients and their families have found these tests valuable. The following are the primary reasons for referral:

  - Patients experiencing drug intolerance, side effects, treatment resistance or therapeutic failure
  - Patients treated with combinations of medications or medical devices
  - Patients who are elderly or infirm
  - Patients hospitalized or with multiple medical conditions

**FDA recognizes value of CYP450 testing in several drug labels for widely used medications.**
The US Food and Drug Administration (FDA) has recognized the value of CYP450 pharmacogenomic biomarkers for prescription of several drugs across multiple medical specialties. At its website, the FDA provides a **Table of Pharmacogenomic Biomarkers in Drug Labels**. The table edited for selected drugs with CYP2D6, CYP2C19, and CYP2C9 pharmacogenomic information in their labels is included here as an **Appendix**. Many labels include specific clinical actions to be taken based on genetic information. The FDA states:

> http://www.fda.gov/Drugs/ScienceResearch/ResearchAreas/Pharmacogenetics/ucm083378.htm
> *Pharmacogenomics can play an important role in identifying responders and non-responders to medications, avoiding adverse events, and optimizing drug dose. Drug labels may contain information on genomic biomarkers and can describe: Drug exposure and clinical response variability, Risk for adverse events, Genotype-specific dosing…*

**CYP450 genotyping guidelines have been published for their use in clinical practice.**
The National Academy of Clinical Biochemistry (NACB) published in 2010 its Laboratory Medicine Practice Guidelines entitled *Laboratory Analysis and Application of Pharmacogenetics to Clinical Practice.* This document from a learned society establishes standards for the laboratory and clinical implementation of CYP450 genotyping. This document is available from the American Association for Clinical Chemistry (AACC) *(https://www.aacc.org/members/nacb/lmpg/onlineguide/publishedguidelines/laacp/pages/default.aspx#).*



**LABORATORY OF PERSONALIZED HEALTH**

NPI: 1336325497

CLIA ID: 07D1036625
CT License: CL-0644
NY Permit: PFI 8648
RI License: LCO-00591
CA License: COS 00800405
FL License: 800026696

**LABORATORY OF PERSONALIZED HEALTH**
*Division of Genomas Inc.*
67 Jefferson Street · Hartford CT  06106
Tel: (860) 545-4589 · Fax: (860) 545-4598
E-mail:  *LPH@genomas.net*
Website: *www.genomas.com/LPH*

The European *Arbeitsgemeinschaft für Neuropsychopharmakologie und Pharmakopsychiatrie (AGNP)* issued guidelines in 2011 for therapeutic drug monitoring (*http://www.ncbi.nlm.nih.gov/pubmed/15551191*) and noted: *The clinical importance of pharmacogenetic factors in the pharmacokinetics and pharmacodynamics of psychoptropic drugs is increasingly recognised. Drug-metabolising enzymes, especially CYP isoenzymes, exhibit genetic variability… Poor metabolisers (PM) lack functional alleles… Extensive metabolisers (EM) are wild-type with 2 active alleles, and ultra-rapid metabolisers (UM) have an amplification of functional alleles. Genetic polymorphisms of drug-metabolising enzymes may be clinically important, because unexpected adverse reactions and toxicity may occur in PM due to increased plasma concentrations and non-response may occur in UM due to subtherapeutic plasma concentrations. Prodrugs are activated by metabolism such as codeine by CYP2D6 to morphine or clopidogrel by CYP2C19 to 2-oxoclopidogrel. PM patients will not be able to produce pharmacologically active metabolites.*

The Genomas Laboratory of Personalized Health (LPH) has been a major contributor to the knowledge base of the field of pharmacogenetics and personalized medicine with 60 publications, including 2 chapters for the NACB/AACC guidelines above. Our presentations and publications can be accessed at: *www.genomas.com/presentations.php* and *www.genomas.com/publications.php*. Please review also our **PATIENT HOME** website (*www.genomas.com/patient/welcome.php*) for public-friendly information on the clinical value of pharmacogenetic testing to the patient. To address specifically the **clinical utility** of the CYP450 testing, I note 6 selected peer-reviewed articles from our own research for your reference:

1. Ruaño G, Szarek B, Villagra D, Gorowski K, Kocherla M, Seip RL, Goethe JW, Schwartz HI.  Length of Psychiatric Hospitalization Correlated with *CYP2D6* Functional Status in Inpatients with Major Depressive Disorder. *Biomarkers in Medicine,* 7 (3): 429-439, 2013
2. Rai M, Seip RL, Gupta A, McKay RG, Hirst J, Thompson PD, Ruaño G.  *CYP2C19* Genotype-Guided Antiplatelet Therapy in a Patient with Clopidogrel Resistance. *Connecticut Medicine,* 76 (5): 267-272, 2012
3. Villagra D, Goethe J, Schwartz HI, Szarek B, Kocherla M, Gorowski K, Windemuth A, Ruaño G.  Novel Drug Metabolism Indices for Pharmacogenetic Functional Status Based on Combinatory Genotyping of *CYP2C9, CYP2C19* and *CYP2D6* Genes. *Biomarkers in Medicine,* 5 (4): 427-438, 2011
4. Ruaño G, Villagra D, Szarek B, Windemuth A, Kocherla M, Gorowski K, Berrezueta C, Schwartz HI, Goethe J.  Physiogenomic Analysis of *CYP450* Drug Metabolism Correlates Dyslipidemia with Pharmacogenetic Functional Status in Psychiatric Patients. *Biomarkers in Medicine,* 5 (4): 439-449, 2011
5. Landino J, Buckley J, Roy J, Gorowski K, Villagra D, Kocherla M, Windemuth A, Ruaño G.  Guidance of Pharmacotherapy in a Complex Psychiatric Case by *CYP450* DNA Typing. *Journal of the American Academy of Nurse Practitioners,* 23 (9):459-463, 2011
6. Ruaño G, Blair CL, Bower B, Windemuth A, Kocherla M, Aleman Y, Pearlson G, Goethe JW,  Schwartz HI. Somatic Complications of Psychotropic Medications in a Patient with Multiple CYP2 Drug Metabolism Deficiencies. *Connecticut Medicine,* 71: 197-200, 2007

Palmetto should join ranks with the FDA, the scientific community and healthcare providers in advancing personalized medicine to protect and promote the health of Medicare patients across the United States. CPT codes **81225** *(CYP2C19)*, **81226** *(CYP2D6)*, **81227** *(CYP2C9)* should be uniformly covered by CMS and MACs to assure the safest, most effective drug prescription. Thank you for your consideration.

Sincerely,

**Gualberto Ruaño, M.D., Ph.D.**
President, Genomas Inc.
Laboratory and Medical Director, Laboratory of Personalized Health
*g.ruano@genomas.net*

3



**LABORATORY OF
PERSONALIZED HEALTH**

NPI: 1336325497

CLIA ID: 07D1036625
CT License: CL-0644
NY Permit: PFI 8648
RI License: LCO-00591
CA License: COS 00800405
FL License: 800026696

**LABORATORY OF PERSONALIZED HEALTH**
*Division of Genomas Inc.*
67 Jefferson Street · Hartford CT  06106
Tel: (860) 545-4589 · Fax: (860) 545-4598
E-mail:  *LPH@genomas.net*
Website: *www.genomas.com/LPH*

## APPENDIX:

### CYP450 Isoenzyme Biomarkers in Drug Labels

Abstracted from the US Food and Drug Administration (FDA) website
*(http://www.fda.gov/Drugs/ScienceResearch/ResearchAreas/Pharmacogenetics/ucm083378.htm).*

### Table of Pharmacogenomic Biomarkers in Drug Labels

The Drug names are hyperlinked to a Drug Link in *Drugs@FDA*

Relevant sections of the label with pharmacogenomic information are noted in the last column of the table.

The table was last updated by the FDA on 06/19/2013.

The + sign denotes a drug combination product.

| *Drug* | Therapeutic Area | CYP450 Isoenzyme | Sections on FDA Drug Label |
|---|---|---|---|
| *Aripiprazole* | Psychiatry | **CYP2D6** | Clinical Pharmacology, Dosage and Administration |
| *Atomoxetine* | Psychiatry | **CYP2D6** | Dosage and Administration, Warnings and Precautions, Drug Interactions, Clinical Pharmacology |
| *Carvedilol* | Cardiovascular | **CYP2D6** | Drug Interactions, Clinical Pharmacology |
| *Cevimeline* | Dermatology and Dental | **CYP2D6** | Drug Interactions |
| *Chlordiazepoxide + Amitriptyline* | Psychiatry | **CYP2D6** | Precautions |
| *Clomipramine* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Clozapine* | Psychiatry | **CYP2D6** | Drug Interactions, Clinical Pharmacology |
| *Codeine* | Analgesics | **CYP2D6** | Warnings and Precautions, Use in Specific Populations, Clinical Pharmacology |
| *Desipramine* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Dextromethorphan + Quinidine* | Neurology | **CYP2D6** | Clinical Pharmacology, Warnings and Precautions |
| *Doxepin* | Psychiatry | **CYP2D6** | Precautions |
| *Fluoxetine* | Psychiatry | **CYP2D6** | Warnings, Precautions, Clinical Pharmacology |
| *Fluoxetine + Olanzapine* | Psychiatry | **CYP2D6** | Drug Interactions, Clinical Pharmacology |

4

**LABORATORY OF
PERSONALIZED HEALTH**

NPI: 1336325497

CLIA ID: 07D1036625
CT License: CL-0644
NY Permit: PFI 8648
RI License: LCO-00591
CA License: COS 00800405
FL License: 800026696

**LABORATORY OF PERSONALIZED HEALTH**
*Division of Genomas Inc.*
67 Jefferson Street · Hartford CT  06106
Tel: (860) 545-4589 · Fax: (860) 545-4598
E-mail:  *LPH@genomas.net*
Website: *www.genomas.com/LPH*

| *Drug* | Therapeutic Area | CYP450 Isoenzyme | Sections on FDA Drug Label |
|---|---|---|---|
| *Fluvoxamine* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Galantamine* | Neurology | **CYP2D6** | Special Populations |
| *Iloperidone* | Psychiatry | **CYP2D6** | Clinical Pharmacology, Dosage and Administration, Drug Interactions, Specific Populations, Warnings and Precautions |
| *Imipramine* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Metoprolol* | Cardiovascular | **CYP2D6** | Precautions, Clinical Pharmacology |
| *Modafinil* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Nefazodone* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Nortriptyline* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Paroxetine* | Psychiatry | **CYP2D6** | Clinical Pharmacology, Drug Interactions |
| *Perphenazine* | Psychiatry | **CYP2D6** | Clinical Pharmacology, Drug Interactions |
| *Pimozide* | Psychiatry | **CYP2D6** | Warnings, Precautions, Contraindications, Dosage and Administration |
| *Propafenone* | Cardiovascular | **CYP2D6** | Clinical Pharmacology |
| *Propranolol* | Cardiovascular | **CYP2D6** | Precautions, Drug Interactions, Clinical Pharmacology |
| *Protriptyline* | Psychiatry | **CYP2D6** | Precautions |
| *Quinidine* | Antiarrhythmics | **CYP2D6** | Precautions |
| *Risperidone* | Psychiatry | **CYP2D6** | Drug Interactions, Clinical Pharmacology |
| *Terbinafine* | Antifungals | **CYP2D6** | Drug Interactions |
| *Tetrabenazine* | Neurology | **CYP2D6** | Dosage and Administration, Warnings, Clinical Pharmacology |
| *Thioridazine* | Psychiatry | **CYP2D6** | Precautions, Warnings, Contraindications |
| *Tolterodine* | Reproductive and Urologic | **CYP2D6** | Clinical Pharmacology, Drug Interactions, Warnings and Precautions |
| *Tramadol + Acetaminophen* | Analgesics | **CYP2D6** | Clinical Pharmacology |
| *Trimipramine* | Psychiatry | **CYP2D6** | Drug Interactions |
| *Venlafaxine* | Psychiatry | **CYP2D6** | Drug Interactions |

5

**LABORATORY OF PERSONALIZED HEALTH**

CLIA ID: 07D1036625
CT License: CL-0644
NY Permit: PFI 8648
RI License: LCO-00591
CA License: COS 00800405
FL License: 800026696

NPI: 1336325497

**LABORATORY OF PERSONALIZED HEALTH**
*Division of Genomas Inc.*
67 Jefferson Street · Hartford CT  06106
Tel: (860) 545–4589 · Fax: (860) 545–4598
E-mail:   *LPH@genomas.net*
Website: *www.genomas.com/LPH*

| *Drug* | Therapeutic Area | CYP450 Isoenzyme | Sections on FDA Drug Label |
|---|---|---|---|
| *Carisoprodol* | Musculoskeletal | CYP2C19 | Clinical Pharmacology, Special Populations |
| *Citalopram* | Psychiatry | CYP2C19 | Drug Interactions, Warnings |
| *Clobazam* | Neurology | CYP2C19 | Clinical Pharmacology, Dosage and Administration, Use in Specific Populations |
| *Clopidogrel* | Cardiovascular | CYP2C19 | Boxed Warning, Dosage and Administration, Warnings and Precautions, Drug Interactions, Clinical Pharmacology |
| *Dexlansoprazole* | Gastroenterology | CYP2C19 | Clinical Pharmacology, Drug Interactions |
| *Diazepam* | Psychiatry | CYP2C19 | Drug Interactions, Clinical Pharmacology |
| *Drospirenone + Ethinyl Estradiol* | Reproductive | CYP2C19 | Precautions, Drug Interactions |
| *Esomeprazole* | Gastroenterology | CYP2C19 | Drug Interactions, Clinical Pharmacology |
| *Lansoprazole* | Gastroenterology | CYP2C19 | Drug Interactions, Clinical Pharmacology |
| *Omeprazole* | Gastroenterology | CYP2C19 | Dosage and Administration, Warnings and Precautions, Drug Interactions |
| *Pantoprazole* | Gastroenterology | CYP2C19 | Clinical Pharmacology, Drug Interactions, Special Populations |
| *Prasugrel* | Cardiovascular | CYP2C19 | Use in Specific Populations, Clinical Pharmacology, Clinical Studies |
| *Rabeprazole* | Gastroenterology | CYP2C19 | Drug Interactions, Clinical Pharmacology |
| *Ticagrelor* | Cardiovascular | CYP2C19 | Clinical Studies |
| *Voriconazole* | Antifungals | CYP2C19 | Clinical Pharmacology, Drug Interactions |
| *Celecoxib* | Analgesics | CYP2C9 | Dosage and Administration, Drug Interactions, Use in Specific Populations, Clinical Pharmacology |
| *Flurbiprofen* | Rheumatology | CYP2C9 | Clinical Pharmacology, Special Populations |
| *Warfarin* | Hematology | CYP2C9 | Dosage and Administration, Precautions, Clinical Pharmacology |

6

**Exhibit F:**
**March 10, 2014 Letter from California Clinical Laboratory Association to Noridian Healthcare Solutions, LLC**

Plaintiffs' Complaint,
*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*



**CALIFORNIA
CLINICAL
LABORATORY
ASSOCIATION**

1127 Eleventh Street, Suite 820  •  Sacramento, CA 95814  •  (916) 446-2646

March 10, 2014

Noridian Healthcare Solutions, LLC JE Part B Contractor Medical Director(s)
Attention: Draft LCD Comments
PO Box 6783
Fargo, ND 58108-6783
Policyb.drafts@noridian.com

### Re: Draft LCD on Drugs of Abuse Testing-DL 34692

The California Clinical Laboratory Association (CCLA) thanks you for holding this comment period for the draft LCD on Drugs of Abuse Testing. The membership of CCLA is gravely concerned about this proposed LCD. Since you will receive specific comments from the CCLA membership on specific aspects of the draft LCD, we shall limit our comments to what we consider to be the five most problematic elements of the draft.

### 1. The draft LCD is out-of-date

The timing of the draft LCD is problematic. The draft LCD is not current. It was originally published three years ago. The use of the three year old language in the LCD does not account for the changing scientific environment. Recent updates to clinical laboratory tests need to be considered. The LCD does not reflect current medical standards and practices.

In addition, the timing of the policy seems inappropriate, based on the expected release of new coding that is scheduled for 2015. Producing an LCD that corresponds to the coding that is scheduled for finalization in 2015 will allow for an effective LCD. Should the proposed LCD be enacted, policy changes will be needed following the implementation of the new coding.

### 2. Office based testing systems are inadequate

*The draft LCD states: "Ongoing patient monitoring with a screening immunoassay without confirmation or quantitative testing is typically sufficient in this patient population" in Group B monitoring patient adherence and compliance during active treatment for substance abuse or dependence*

This provision of the draft LCD must be revised. Patients receiving treatment for substance abuse and dependence are highly sophisticated with regard to the effectiveness of point of care testing "POCT" systems. Numerous illicit and abused prescription drugs cannot be detected using waived or moderate complexity immunoassay methods. During

a time when both medical and recreational narcotics are easily obtainable, diligent and close monitoring of patients using specialty testing is crucial for the diagnosis, treatment and rehabilitation of these patients. As reported in a letter from Andrew A. Monte, M.D., assistant professor, emergency medicine, University of Colorado School of Medicine, Denver, published on January 23, 2014 in the New England Journal of Medicine, the use of synthetic marijuana sent at least 263 people in for emergency treatment over a one month period in Colorado last fall. Dr. Monte explained that the typical users of synthetic marijuana were trying to "beat" a drug test, because the chemicals in synthetic marijuana are not easily detected in the blood or urine. Reliance on screening immunoassay alone, as proposed in the draft LCD, is likely to cause the situation seen in Colorado last year to expand and worsen-- increasing health care costs.

**Until technology for POCT catches up with the drugs and chemicals that are being developed and diverted by users who are dependent upon them, adopting a testing coverage policy that will encourage the utilization of more dangerous and harmful agents is not only misguided but dangerous.** Clinicians must be able to utilize specialized testing when they feel it is needed for the proper diagnosis, treatment and rehabilitation of these patients.

### 3. Blanket denial of confirmative tests for preliminary negative results is" bad medicine"

In-office point of care screens (POC) have limitations inherent in its technology that will likely cause issues of false positives and false negatives that can only be detected by laboratory definitive testing.

Definitive testing by LC-MS/MS is performed to identify both the specific drugs and their metabolites, essentially ensuring no false negatives or false positives. The second, and more optimal approach, includes sending the sample from the in-office POC IA straight to LC-MS/MS for definitive testing, which as can be seen, may miss a drug class anywhere from 20-50% of the time.

### 4. Contradictory directives concerning testing for a broad range of drugs & for confirmatory testing must be brought into alignment

The draft LCD states that quantitative testing is not needed if a patient admits to an aberrant behavior (i.e., if a patient admits to marijuana when it shows up on a point-of-care screen, why send to the lab for confirmation?). This is reasonable for the specific drug in question, but a potentially large error may be made here by not checking for other specific drugs. When considering the disease of addiction or the business of diverting pharmaceuticals, there is a high degree of shared communication on the street and through internet clearinghouses (http://www.bluelight.ru/vb/; http://forum.opiophile.org/forum.php) which adequately train people on ways to "trick the cup."

But many of these techniques are not useful when examined with quantitation methods. For another example, a patient has a positive on IA for marijuana and admits to this, so no further testing is done. If this occurs, there is no chance to see if they are being totally forthcoming or if a LC-MS/MS test would have shown the cocaine and heroin they also used. This gets to the potential need to go straight to LC-MS/MS testing so a definitive answer is provided and better clinical decision-making can occur. Keeping the option of sending the sample to the lab for other potential issues would be wise (and remember, IA typically addressed classes of medications as opposed to specific drugs and their metabolites).

**5. Specimen Validity Testing is Needed**

Do not exclude coverage for of specimen validity testing. Specimen validity testing is not a quality control.  The current standard of care in the medical field is to perform specimen validity testing contemporaneously with qualitative drug testing. Specimen validity includes one or more diagnostic tests to determine the relative concentration of solutes in the urine sample (creatinine, specific gravity) and indicators of  chemical modifiers that may have been added to the urine sample (pH, oxidants). **Specimen validity results reported as discrete test results should be included for coverage. Such testing is crucial to determine whether a patient's sample has been altered in order to mask the presence of illegal or illicit drugs, and should be covered when it is reasonable and all patient drug testing criteria have been met for covered drug indications.**

**Conclusion**

The California Clinical Laboratory Association looks forward to your response to the above comments. CCLA would like to schedule a meeting to discuss the draft LCD on Drugs of Abuse Testing and would like to express the association's willingness to work with the MAC to enhance the usefulness of the proposed LCD.

Thank you for your consideration of these comments.

Sincerely,

Michael J. Arnold
Executive Director, CCLA

**Attachments:**
1. Synthetic Pot Tied to Surge of Emergency Cases

CC:    **CCLA Membership**
       **Dr. Bernice Hecker, Executive Medical Director Noridian**
       **Mike Barlow, VP J1 Director Palmetto GBA**

**Synthetic Pot Tied to Surge of Emergency Cases**

Colorado patients were delirious, combative, had seizures and breathing problems

**By Brenda Goodman**
*HealthDay Reporter*

WEDNESDAY, Jan. 22, 2014 (HealthDay News) -- Doctors in Colorado are sounding an alarm about the dangers of synthetic marijuana after seeing a surge of emergency cases tied to its use.

The products, sold under names like Black Mamba, Crazy Clown, K2 and Spice, sent at least 263 people for emergency treatment statewide over a one-month period last year.

"At the end of August, we started noting that patients were coming in with a very severe clinical illness," said Dr. Andrew Monte, an assistant professor in emergency medicine at the University of Colorado School of Medicine in Denver.

Monte said patients were delirious; they were fighting medical staff. Their pulses were racing and many went on to have seizures. Seven patients were put on ventilators in the intensive care unit after they developed trouble breathing. All survived.

Monte said the cases they counted before the outbreak ended Sept. 19 were probably just a fraction of the total.

"All these kinds of toxicologic outbreaks are far underreported, for a couple of reasons," he said.

First, not everybody who got sick went to the hospital. Monte thinks most people would try to stay at home and wait out the bad reaction, especially if their symptoms weren't as severe. Second, some patients probably weren't asked about drug use or wouldn't admit to it, making the final case count lower than it really was, he noted.

The surge in cases was reported in a letter published Jan. 23 in the *New England Journal of Medicine* and in the Dec. 13 *Morbidity and Mortality Weekly Report* from the U.S. Centers for Disease Control and Prevention.

Colorado isn't the only state to see a rise in poisonings tied to synthetic pot.

According to an earlier report from the U.S. Substance Abuse and Mental Health Services Administration, the number of emergency department visits associated with use of synthetic pot more than doubled from 2010 to 2011, with the case count increasing from about 11,400 to more than 28,500 nationwide.

Synthetic marijuana is dried plant material that has been sprayed with laboratory-created psychoactive chemicals that mimic THC, the active ingredient in marijuana. It's sold in gas stations and head shops as an herbal product. But experts say there's nothing natural about it.

"This is much closer to meth [methamphetamine] than it is to marijuana," said Mike Van Dyke, chief of environmental epidemiology and occupational health at the Colorado Department of Public Health and Environment in Denver.

"This is not a natural product. This is a chemical," said Van Dyke, who was involved in tracking the outbreak.

What's more, Van Dyke said, consumers never really know what they're buying.

"It's different from batch to batch. The whole chemical can be completely different from batch to batch, and you just don't know what you're getting when you buy these things," he said. "It's very dangerous."

Monte said most of the synthetic marijuana users treated in the ER last fall were men, and the majority were in their late 20s.

He said the typical user seems to be a person who needs to beat a drug test. The chemicals in synthetic marijuana aren't easily detected in the blood or urine.

For that reason, both experts said they didn't think synthetic marijuana use would drop now that the real thing could be legally purchased in the state.

Although synthetic marijuana is illegal under Drug Enforcement Agency law, Monte said the drug makers get around that by changing the chemicals and packaging.

**More information**

For more information on the dangers of synthetic marijuana, visit the American Association of Poison Control Centers.

Copyright © 2014 HealthDay. All rights reserved.

SOURCES: Andrew A. Monte, M.D., assistant professor, emergency medicine, University of Colorado School of Medicine, Denver; Mike Van Dyke, chief, environmental epidemiology and occupational health, Colorado Department of Public Health and Environment; Jan. 23, 2014, *New England Journal of Medicine*

Last Updated: Jan 22, 2014

**Exhibit G:**
**March 11, 2014 Letter from Florida Attorney General to CMS; March 13, 2014 Letter**
**from Kentucky Attorney General to CMS; and March 7, 2014 Letter from Florida**
**Department of Children and Families to First Coast Service Options, Inc.**

Plaintiffs' Complaint,
*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*



# STATE OF FLORIDA

### PAM BONDI
### ATTORNEY GENERAL

March 11, 2014

Marilyn Tavenner, Administrator
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

      Re:    Restrictions on Use of Diagnostic Tests for Identification and Treatment of
                Drug Abuse

Dear Administrator Tavenner:

I write to urge you to take swift action to halt the coordinated, nation-wide efforts of
Medicare administrative contractors to effectively end the use of confirmatory drug
testing for preliminary, false-negative drug screens. I'm sure you are aware that Florida
is in the midst of a protracted battle against prescription and illicit drug abuse. The toll
this battle has taken on Florida's families is staggering -- yet now, through the
publication of local coverage determinations, the Centers for Medicare & Medicaid
Services (CMS) seeks to restrict access to one of the most critical tools used in
identifying drug misuse and abuse[1]. Moreover, our fear is that if Medicare goes down
this path, Medicaid will soon follow suit.

Upon a patient's initial visit in many care settings (geriatric rheumatology, pre-surgical,
obstetric, addiction treatment, pain management, etc.), and thereafter as dictated by the
patient's case and the applicable standard of practice, a physician will often conduct a
qualitative urine drug screen using a simple specimen cup. These cups render a basic
"positive" or "negative" result. The technology behind these screening cups is 30-years
old, and they do not distinguish between specific types or identify quantities of drug
substances. Most importantly, it is widely understood in the medical community that the
cups frequently yield "false positive" and "false negative" results. The latter can be life-
threatening to a patient.

---

[1] See Local Coverage Determination (LCD): Drugs of Abuse and Testing (DL 34956); Drugs of Abuse and
Testing (DL 34692); and Controlled Substance Monitoring and Drugs of Abuse Testing (L34398).

*PL-01, The Capitol, Tallahassee, Florida 32399-1050, Telephone (850) 414-3300 Fax (850) 487-2564*

Administrator Marilyn Tavenner
March 11, 2014
Page 2

Because of the unreliability of these screening devices physicians, based upon their own medical judgment and the circumstances of the individual patient's case, often choose to send the specimen to a clinical laboratory for "confirmatory testing." As suggested above, identifying a "false-negative" result is typically more important than identifying a false positive because of the life-threatening consequences to the patient if his or her physician prescribes a controlled substance without knowing that the patient is already on a controlled or illicit drug. The tool of confirmatory testing is critical to the health care provider's ability to protect and treat patients. If the ability to perform confirmatory testing, particularly negative confirmatory testing, is eliminated, word will rapidly spread in the drug-using community that all one need do is "beat the cup," in order to more easily acquire prescription drugs. Indeed, a simple Google search of "how to beat a drug test" will yield tens of millions of hits in less than a second. I can assure you, Administrator Tavenner, that these concerns are based in fact and our bitter experiences in Florida.

An innocent and often overlooked population in this epidemic of drug abuse are the newborn. Over the last several years we observed a spike throughout our state in infants born with Neonatal Abstinence Syndrome (NAS). NAS manifests in the newborn as complications from the withdrawal process after being born to a drug addicted mother. In response to this tragedy, the Florida Legislature created, and I chaired, the *Statewide Task Force on Prescription Drug Abuse in Newborns*. I learned from this effort that illicit drug use during pregnancy in Florida was on the rise. Tragically, some data shows that as high as fifty percent (50%) of pregnant women fail to self-report to their OB-GYN taking opioids or antidepressants during pregnancy. This omission could prove deadly to mothers and their babies, particularly if the OB-GYN performs a drug screening and the cup yields a false-negative result - either because of its unreliability or because the mother purposefully beat the drug test. In this instance, the only way the physician can protect mother and baby is to confirm the results of the negative screen. Taking this critical diagnostic tool away from a woman's OB-GYN is unconscionable.

To effectively combat drug abuse the federal government must apply policies in a consistent and uniform fashion. That is not happening. Just last week, articles from Associated Press[2] and the *Washington Post*[3] described the Obama administration's concern with the skyrocketing use of heroin.[4] The *Post* article quoted many sources

---

[2] http://hosted.ap.org/dynamic/stories/U/US_JUSTICE_HEROIN?SITE=AP&SECTION=HOME&TEMPLAT E=DEFAULT&CTIME=2014-03-10-06-03-31

[3] http://www.washingtonpost.com/politics/experts-officials-missed-signs-of-prescription-drug-crackdowns-effect-on-heroin-use/2014/03/06/2216414a-9fc1-11e3-b8d8-94577ff66b28_story.html

[4] Importantly, a drug screen cannot distinguish heroin from certain opiates that a treating physician could lawfully prescribe. It must be identified through confirmatory testing of the "positive" result of the screen.

Administrator Marilyn Tavenner
March 11, 2014
Page 3

attributing the spike in the use of heroin to the crackdown on abuse of prescription pain
medications. According to the AP article, Attorney General Holder stated:

> Addiction to heroin and other opiates, including certain prescription pain-
> killers, is impacting the lives of Americans in every state, in every region,
> and from every background and walk of life - and all too often, with deadly
> results. . . . Confronting this crisis will require a combination of
> enforcement *and treatment*. The Justice Department is committed to both.

The Department of Justice and the Department of Health and Human Services/CMS
*must* be on the same page. Access to treatment is pivotal – and one agency in the
administration cannot advocate its importance while another removes access to a
critical diagnostic and treatment tool under the rationale of "cost savings."

Thank you for attention to this important issue.

Sincerely,

Pam Bondi
Attorney General

cc:    The Honorable Rick Scott
       Office of the Governor
       State of Florida
       The Capitol
       400 S. Monroe Street
       Tallahassee, FL 32399-0001

       Acting Director Michael Botticelli
       Office of National Drug Control Policy
       750 17th Street NW
       Washington, DC 20503

       James Corcoran, M.D.
       Chief Contractor Medical Director
       First Coast Service Options, Inc.
       Medical Policy and Procedures
       P.O. Box 2078
       Jacksonville, FL 32231-0048
       Email: Medical.Policy@FCSO.com

Administrator Marilyn Tavenner
March 11, 2014
Page 4

Dr. Bernice Hecker
Dr. Charles Haley
Noridian Healthcare Solutions, LLC JE Part B Contractor Medical Director(s)
Attention: Draft LCD Comments
P.O. Box 6783
Fargo, ND 58108-6783
Proposed LCD ID: DL34692

Proposed LCD Title: Drugs of Abuse Testing
Paul O'Donnell, Vice President
Noridian Healthcare Solutions, LLC (01182 - MAC - Part B)
900 42nd Street S
P.O. Box 6781
Fargo, ND 58108

Dr. Elaine Jeter
Medical Director
Palmetto GBA, J11 MAC
Mail Code: AG-600
P.O. Box 100190
Columbia, SC 29202-3190



COMMONWEALTH OF KENTUCKY
## OFFICE OF THE ATTORNEY GENERAL

JACK CONWAY
ATTORNEY GENERAL

March 13, 2014

CAPITOL BUILDING, SUITE 118
700 CAPITAL AVENUE
FRANKFORT, KENTUCKY 40601
(502) 696-5300
FAX: (502) 564-2894

Ms. Marilyn Tavenner, Administrator
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

**Re:    Restrictions on Use of Diagnostic Tests for Identification and Treatment of Drug Abuse; Proposed LCD ID: DL34692 -- Drugs of Abuse Testing**

Dear Administrator Tavenner:

I write regarding my concern that the Center for Medicare and Medicaid Services ("CMS") and Kentucky's Medicare Contractor, CGS, have sought to cease reimbursement under Medicare for "confirmatory testing" of laboratory results. As I am sure you are aware, Kentucky, along with many other states in the nation, is facing a prescription drug epidemic which has affected every Kentucky community and nearly every Kentucky family. The human and financial tolls of this epidemic are staggering. Kentucky has the sixth-highest overdose rate in the country. Since 2000, the number of unintentional deaths due to drug overdose has jumped from 205 to over 1,000 in 2012. For context, that means more people died in Kentucky last year because of prescription drug overdose than in traffic accidents. Therefore, we need every tool available to combat this epidemic.

In Kentucky, upon initial prescribing of certain opioids and other drugs, physicians are required to conduct a drug screen to determine if it is appropriate to prescribe these addictive substances to his or her patient. Some tests are more reliable than others and often a physician will administer a quick, relatively less-sensitive, urine test in the office setting. These preliminary tests, however, will often produce false negative results. Unfortunately, some patients seeking drugs know how to beat these tests. Often times, the physician, based on his or her knowledge and experience, has cause to question the results of these tests. In that instance, the physician often orders a more sensitive laboratory test to verify the initial negative result. Frequently, the physician is correct and the more sensitive test helps avoid a potentially life threatening result. Under the proposed new rule, these verification tests will no longer be reimbursed by Medicare.

I do appreciate the desire to combat fraud, waste, and abuse. Since I became Attorney General, my Office of Medicaid Fraud Control and Abuse has recovered over $250 Million for the Kentucky Medicaid Program. However, ceasing to cover an important test used to combat prescription drug abuse is not the answer. Instead, we urge CMS to consider alternative, less drastic measures. For example, a prior authorization procedure with specific detailed documentation could

Ms. Marilyn Tavenner
Page Two
March 13, 2014

be implemented.  This procedure is used frequently for services which are either costly or contain special risks.  By implementing this procedure, CMS would be able to ensure that CMS will only reimburse for these tests when the physician feels it is absolutely necessary.

Thank you for attention to this important issue.

Sincerely,

Jack Conway
Kentucky Attorney General

c:      Dr. Bernice Hecker/Dr. Charles Haley
        Noridian Healthcare Solutions, LLC

        Mr. Mike Barlow/Dr. Elaine Jeter
        Palmetto GBA

        Earl Berman, MD, FACP
        CSG Administrators, LLC

        James Corcoran, MD
        First Coast Service Options, Inc.



**State of Florida**
**Department of Children and Families**

MYFLFAMILIES.COM

Rick Scott
*Governor*

Esther Jacobo
*Interim Secretary*

March 7, 2014

Attn: Sandy Coston
First Coast Service Options, Inc.
C/- Medical Policy
532 Riverside Ave,
ROC 19T
Jacksonville, FL 32202

RE: Local Coverage Determination (LCD): Drugs of Abuse Testing (DL34956).

Ms. Coston:

As you may know, Florida has suffered from a prescription drug epidemic in recent years.
Governor Rick Scott led the charge to ban the rampant direct dispensation of prescription
narcotics (the so-called "Pill Mills") in Florida in an attempt to combat prescription drug abuse in
our state. At its peak, seven Floridians per day were dying as a result of prescription drug
overdose, but we have begun to reduce that trend through combination of law enforcement,
effective treatment, and prevention.

We have become aware that First Coast Service Options, Inc., has sought to limit coverage
under Medicare for "confirmatory testing" of laboratory results. While we support attempts to
reduce over-utilization or unnecessary laboratory testing, we remain concerned that curtailing
one sub-category of confirmatory testing (namely confirmatory testing of potential false
negatives in the drug abuse and addiction contexts) could result in unwelcome public health
consequences.

The proposed draft guidelines currently listed by First Coast would potentially walk the science
back by disallowing confirmatory quantitative laboratory testing of the less sensitive cup tests as
physicians attempt to combat prescription drug abuse. A physician's clinical decision-making
authority is important in the context of confirmatory testing of false negatives, and any policies to
limit the availability of confirmatory testing in the drug abuse context should be carefully
considered, and based only on scientific evidence and the careful balancing of the public health
interests at stake.

We appreciate your consideration of these concerns, and thank you for your continued service
to our citizens.

Best regards,

Dr. Nevin Smith, PhD
Assistant Secretary for Substance Abuse and Mental Health

1317 Winewood Boulevard, Tallahassee, Florida 32399-0700

Mission: Protect the Vulnerable, Promote Strong and Economically Self-Sufficient Families, and
Advance Personal and Family Recovery and Resiliency

Copies:
Renard Murray, Centers for Medicare and Medicaid Services Regional Administrator for Region 4.
Cherie Weatherington, Centers for Medicare and Medicaid Services Associate Regional Administrator for Region 4.
James Corcoran, M.D., Chief Contractor Medical Director, First Coast Service Options, Inc.
Bernice Hecker, M.D., Medical Director, Noridian Healthcare Solutions.
Paul O'Donnell, Vice President, Noridian Healthcare Solutions.
Elaine Jeter, M.D., Medical Director, Palmetto GBA.
Michael Anway, Staff Director, Office of Policy and Budget, Florida Governor's Office.