# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CALIFORNIA CLINICAL LABORATORY ASSOCIATION, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 14-cv-0673 (KBJ) |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiffs California Clinical Laboratory Association ("CCLA") and Jane Doe have brought the instant action to challenge certain Medicare coverage determinations that private entities—known as Medicare Administrative Contractors ("MACs")—make. Congress has expressly authorized Defendant Secretary of the Department of Health and Human Services (the "Secretary") to use MACs to help administer the Medicare program, and under the existing statutory and regulatory scheme, MACs routinely establish local Medicare coverage practices by issuing statements regarding whether or not, as a general rule, Medicare insurance will be available for particular items or services within a geographic region. These statements are known as "local coverage determinations" or "LCDs," and Plaintiffs' complaint alleges, *inter alia*, that MACs are issuing LCDs that amount to blanket and inappropriate denials of Medicare coverage for certain clinical testing services. Plaintiffs also launch several broad attacks against the LCD development process and the resulting coverage (or non-coverage) practices,

including the charge that Congress has acted unconstitutionally in delegating to private contractors the authority to issue LCDs.

Before this Court at present is Defendant's motion to dismiss Plaintiffs' complaint. The Secretary argues that Jane Doe lacks constitutional standing to bring the instant claims, and that, in any event, this Court does not have subject matter jurisdiction over Plaintiffs' claims under any of the statutes upon which Plaintiffs rely. (*See* Def.'s Mot. to Dismiss ("Def.'s Mot.") 1, ECF No. 17; *see also* Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Br.") 15, ECF No. 17-1.)[1] For the reasons explained below, this Court concludes that Jane Doe has failed to allege a sufficient injury-in-fact to give rise to Article III standing, and that this Court lacks subject matter jurisdiction over CCLA's remaining claims. Consequently, Defendant's motion to dismiss the complaint will be **GRANTED**, and Plaintiffs' complaint will be dismissed without prejudice. A separate order consistent with this opinion will follow.

## I.  BACKGROUND

### A. Background Facts

Jane Doe is a retired, 82 year-old registered nurse who lives in Virginia and is a Medicare enrollee. (Compl. ¶ 6, ECF No. 3.)[2] Plaintiffs allege that Doe has been diagnosed with "several chronic conditions requiring the administration of numerous [prescription] drugs," and that, unfortunately, some of those drugs have caused her to "suffer[] allergic and other very serious adverse reactions[.]" (*Id.*) Hoping to learn

---

[1] All page numbers cited in this memorandum opinion refer to the page numbers that the Court's electronic filing system assigns.

[2] Jane Doe explains that she is using a pseudonym in the instant case "to protect the confidential nature of her specific health information." (Compl. ¶ 6; *see also* Order, ECF No. 2 (granting motion to proceed via pseudonym).)

more about Jane Doe's reactions to medication and to customize further treatment, Doe's "physician recently ordered pharmacogenomic testing from a clinical laboratory in Virginia." (*Id.*) Pharmacogenomic testing is a type of molecular diagnostic testing that can anticipate a medication or treatment's effect on a patient based on that patient's genetic makeup. (*See id.* ¶¶ 6, 27; *see also* Decl. of Scott W. Blevins ("Blevins Decl.") ¶ 1, Ex. 1 to Pls.' Opp'n, ECF No. 18-1 (explaining that "genotyping of drug-metabolizing enzymes and bleeding risk factors . . . enables health care practitioners to provide targeted therapy to patients based on patients' individual genetic profiles").) The parties do not dispute that such testing may allow doctors to determine in advance whether a particular medication or course of treatment will help or harm a patient.

Doctors can order pharmacogenomic and other molecular diagnostic testing from certain clinical laboratories across the United States. The complaint does not specify which Virginia laboratory received the doctor's order for the pharmacogenomic testing of Jane Doe; however, Plaintiffs explain that CCLA's members include laboratories that provide such testing for Medicare enrollees and other individuals. (*See* Compl. ¶ 5; *see also* Blevins Decl. ¶ 3.) Specifically, Plaintiffs state that one of CCLA's member laboratories is GENETWORx, "a clinical laboratory headquartered in Glen Allen, Virginia" (Blevins Decl. ¶ 1), and that GENETWORx "conducts [pharmacogenomic] testing of samples from patients located throughout the United States" (*id.* ¶ 2). When GENETWORx provides services to Medicare Part B enrollees, it must submit claims for reimbursement to Palmetto GBA ("Palmetto"), which is the MAC assigned to cover GENETWORx's region. (*See* Blevins Decl. ¶ 3.) Palmetto has issued a local coverage determination known as "LCD L34499," which Plaintiffs contend Palmetto relies on to

"den[y] Medicare coverage for pharmacogenomic testing regularly performed by GENETWORx" and other laboratories in Palmetto's region.  (*Id.*)  Indeed, according to the complaint, "Jane Doe has learned that Medicare will not cover or pay for [her pharmacogenomic] testing" because of LCD L34499.  (Compl. ¶ 6.)

Plaintiffs maintain that LCD L34499 and other similar LCDs pertaining to clinical testing "jeopardize[] [Jane Doe's] and similarly situated Part B enrollees' access to medically necessary laboratory services" (*id.*), and more broadly, that "[t]he current LCD development process and the resulting LCD policies of the MACs are legally invalid and *ultra vires*" (*id.* ¶ 2).  Thus, Plaintiffs have directly challenged an aspect of the coverage system that the Medicare Act creates; the following brief description of the Medicare system provides the necessary context for understanding Plaintiffs' claims.

## B.  The Medicare Act

Congress established the Medicare program in 1965 when it passed the Medicare Act (the "Act"), 42 U.S.C. §§ 1395 et seq., as part of the Social Security Amendments of 1965.  *See* Pub. L. No. 89-97, 79 Stat. 291 (July 30, 1965).  The program provides health benefits to all persons age sixty-five and older who are eligible for Social Security benefits or eligible for retirement benefits under the railroad retirement system, *see* 42 U.S.C. § 1395c(1), and is divided into several parts that the Secretary administers through the Centers for Medicare and Medicaid Services ("CMS"), along with the MACs.  Medicare Part A, the program's hospital insurance component, covers inpatient care in facilities such as hospitals and skilled nursing facilities, as well as hospice care and some home healthcare.  *See Hall v. Sebelius*, 770 F. Supp. 2d 61, 64 (D.D.C. 2011) (citing 42 U.S.C. §§ 1395c–1395i-5).  Individuals who receive benefits

under Medicare Part A are commonly referred to as "Medicare beneficiaries."  The

instant case concerns Medicare Part B, which is the supplementary medical insurance

program that covers certain physicians' services, outpatient hospital care, and other

medical items and services not covered under Part A.  *See id.* (citing 42 U.S.C.

§§ 1395j–1395w-5).  Individuals must enroll in Medicare Part B to receive coverage,

which is why recipients of Part B benefits are sometimes referred to as "Medicare

enrollees."

While Part B is specifically designed to fill coverage gaps in Part A, there are

limits to what Part B coverage entails.  As relevant here, the Act expressly provides that

"no payment may be made . . . for any expenses incurred for items or services which

. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury

or to improve the functioning of a malformed body member[.]"  42 U.S.C.

§ 1395y(a)(1)(A).  In other words, Medicare Part B covers only "reasonable and

necessary" items and services.  *Id.*

1.  <u>MAC Determinations And Provider Reimbursement Under Medicare
    Part B</u>

In order to obtain payment for items and services provided to Medicare Part B

enrollees, healthcare providers generally must submit claims for reimbursement directly

to the designated MAC for the provider's region.  *See id.* §§ 1395kk-1(a)(1)–(4)

(authorizing the Secretary to contract with MACs to perform certain functions including

payment functions).  Prior to paying the claim, the MAC must assess whether Part B

covers the items or services at issue—*i.e.*, the MAC must make a determination as to

whether the particular items or services are "reasonable and necessary" under the Act

and, thus, whether Medicare will cover the costs associated with the particular item or

service.  *See id.* § 1395kk-1(a)(4).  Such determinations concerning "whether an individual is entitled to benefits" under the Act are commonly referred to as "initial" coverage determinations.  *Id.* § 1395ff(a)(1).

The Secretary may dictate the outcome of a MAC's initial coverage determination in one of two ways.  First, the Act authorizes her to promulgate regulations regarding covered items or services.  *See id.* §§ 1395hh, 1395ff.  Second, she may issue "national coverage determination[s]," known as "NCDs," which are "determination[s] by the Secretary with respect to whether or not a particular item or service is covered" on a nationwide basis.  *Id.* § 1395ff(f)(1)(B).  The Secretary's Medicare coverage regulations and NCDs are binding on MACs such that if a relevant regulation or NCD exists with respect to a provider's claim, a MAC must apply that regulation or NCD to determine coverage.  *See* 42 C.F.R. § 405.1060(a)(4); *see also* 42 U.S.C. § 1395ff(c)(3)(B)(ii)(I).  In the absence of such direction from the Secretary, MACs may either make initial coverage determinations on a claim-by-claim basis or, in the interest of efficiency, MACs may develop and adopt local coverage determinations—LCDs—establishing "whether or not a particular item or service is covered" within the geographic region assigned to the particular MAC.  42 U.S.C. § 1395ff(f)(2)(B).  LCDs thus facilitate a MAC's automated review of claims for items or services that fall within each LCD's scope.  Notably, LCDs only apply within the authoring MAC's assigned region.  *See id.* (defining LCDs as "determination[s] . . . respecting whether or not a particular item or service is covered on a[] [MAC]-wide basis").

In the event that a MAC makes an initial coverage determination denying Medicare coverage for a particular claim, the provider that submitted the claim typically bears financial responsibility for the items or services at issue, unless the provider has previously given the Medicare beneficiary or enrollee (who are generally referred to throughout this opinion as "Medicare recipients") an "advance beneficiary notice" or "ABN" stating "that Medicare will likely deny payment for the service or item to be furnished."  CMS, Medicare Claims Processing Manual, Ch. 30 § 40.1.1.  The ABN is, in essence, a cost-shifting mechanism: if the provider gives a Medicare recipient such advance notice, then instead of the provider bearing the cost of the denial of the service, the recipient "is held liable for the denied services or items[.]"  *Id.*; *see also Int'l Rehabilitative Scis. Inc. v. Sebelius*, 688 F.3d 994, 998 (9th Cir. 2012) (citing 42 C.F.R. § 411.404) (explaining that Medicare providers bear the financial risk of coverage denials in absence of written advance beneficiary notices shifting financial responsibility to Medicare recipients).

> 2.  Appeals Of Initial Coverage Determinations And Challenges To LCDs

Under the Act, providers may appeal a MAC's initial coverage determination—including a coverage determination made pursuant to an LCD—through the standard Medicare claims review process.  *See* 42 U.S.C. §§ 1395ff(b)–(e); *see also* 42 C.F.R. § 405.900 et seq.  That process ordinarily entails administrative requests for reconsideration, a hearing before an administrative law judge ("ALJ"), and, if desired, review by the Departmental Appeals Board ("DAB").  *See* 42 C.F.R. § 405.904(b).

Importantly, although ALJs and the DAB "are not bound by LCDs" when hearing appeals from initial coverage determinations, *id.* § 405.1062(a), neither ALJs nor the DAB can "set aside or review the validity of an . . . LCD for purposes of a claim

appeal" during the standard claims review process, *id.* § 405.1062(c).  However, ALJs and the DAB *can* review and invalidate an LCD in the context of a Medicare recipient's administrative challenge under a different section of the Act:  section 1395ff(f)(2).  *See* 42 U.S.C. § 1395ff(f)(2)(A).  Section 1395ff(f)(2) creates a special administrative process that allows a Medicare recipient—but not a Medicare provider—to file a complaint with an ALJ seeking review of a particular LCD.  *Id.* § 1395ff(f)(2)(A)(i); *see also id.* § 1395ff(f)(5).  Any decisions that ALJs make regarding LCD validity in this context are then subject to further review by the DAB, *id.* § 1395ff(f)(2)(A)(ii), and any resulting DAB decision "constitutes a final agency action . . . subject to judicial review," *id.* § 1395ff(f)(2)(A)(iv).[3]

Significantly for present purposes, the Act also provides a direct path to judicial review for Medicare recipients who seek to challenge LCDs on purely legal grounds. *See id.* § 1395ff(f)(3).  Under section 1395ff(f)(3), a Medicare recipient "may seek review [of an LCD] by a court of competent jurisdiction without filing a complaint under [section 1395ff(f)(2)] and *without otherwise exhausting other administrative remedies*[,]" but only if "there are no material issues of fact in dispute, and the only issue of law is the constitutionality of a provision of this subchapter, or that a regulation, determination, or ruling by the Secretary is invalid[.]"  *Id.* § 1395ff(f)(3) (emphasis added).

---

[3] The DAB encompasses a body known as the Medicare Appeals Council, *see* 42 C.F.R. § 405.370, which is sometimes also (confusingly) referred to as the "MAC," *id.* § 405.902.  This memorandum opinion will refer to the DAB and the Medicare Appeals Council collectively as the "DAB."

### C. Procedural History

Plaintiffs filed the instant five-count complaint in this Court on April 18, 2014, in order to challenge the validity of certain LCDs concerning clinical testing without first undertaking any administrative appeals process.  (*See* Compl. ¶¶ 1–2.)  Count I alleges that Congress' delegation of the authority to develop LCDs to MACs is unconstitutional.  (*See id.* ¶ 38.)  Count II contends that clinical testing LCDs constitute new Medicare policy, and under section 1395hh(a) of the Act, such policy must be promulgated pursuant to rulemaking requirements under the Administrative Procedure Act ("APA").  (*See id.* ¶ 40.)  Count III asserts that MACs have relied on impermissible criteria to develop clinical testing LCDs, and have thereby violated section 1395ff(f)(2)(b) of the Act.  (*See id.* ¶¶ 42–43.)  And Counts IV and V claim that the Secretary has failed to perform certain duties the Act requires, including the duty to develop a plan to evaluate LCDs under section 1395y(*l*)(5) and to establish a mediation process to resolve LCD disputes under section 1395ff(i).  (*See id.* ¶¶ 46, 49.)

Defendant filed the pending motion to dismiss on July 2, 2014.  (*See* Def.'s Mot. 2.)  Defendant contends, *inter alia*, that Jane Doe has failed to allege sufficient injury to give rise to Article III standing because it is undisputed that she had pharmacogenomic testing done and has received those test results, and the complaint does not allege that Doe had to pay any out-of-pocket expenses after Palmetto denied Medicare coverage.  (*See* Def.'s Br. 17–20.)  Defendant further argues that, even if Doe has standing to sue, her claims challenging the validity of clinical testing LCDs raise issues of material fact, meaning that Doe cannot use section 1395ff(f)(3) as a shortcut to judicial review and must instead exhaust her administrative remedies under section 1395ff(f)(2), which she has not yet done.  (*See id.* 20–22.)  Similarly, Defendant maintains that, to the extent

that CCLA seeks to advance the instant claims independent of Jane Doe, expedited judicial review under section 1395ff(f)(3) is not available because that provision's direct path to court is open only to Medicare *recipients* (*see id.* 8 ("Unlike the laboratories that CCLA represents, an individual beneficiary can bring a claim in federal court [challenging an LCD] without first exhausting administrative remedies[.]"), and this Court otherwise lacks subject matter jurisdiction over CCLA's claims because CCLA has failed to exhaust its administrative remedies under the standard Medicare claims review process as the Act requires (*see id.* 24–27, 31). Moreover, Defendant insists that mandamus jurisdiction under 28 U.S.C. § 1361 is not available in the instant case because Plaintiffs have failed to allege adequately either that they have any "'clear right to relief'" or that the Secretary had any "'clear duty to act'" with respect to the statutory provisions at issue.  (*Id.* 29 (quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010).)[4]

Plaintiffs respond that Congress expressly gave Medicare beneficiaries and enrollees like Jane Doe standing to challenge LCDs in federal court; that Jane Doe's LCD challenge does not involve issues of material fact; and that the standard Medicare claims review process is not an adequate avenue of relief for CCLA's members because it cannot grant them the relief they seek—namely, invalidation of certain clinical testing LCDs.  (*See* Pls.' Opp'n to Def.'s Mot. ("Pls.' Opp'n") 14–18, 20–22, ECF No. 18.) Furthermore, Plaintiffs insist that the Medicare provisions at issue in this case are

---

[4] Defendant also initially argued that CCLA, too, lacked standing to sue because Plaintiffs' complaint did not identify a particular CCLA member that was qualified to sue.  (*See* Def.'s Br. 22–23.) However, Defendant appears to have conceded in its reply brief that Plaintiffs "corrected that particular defect" when they attached to their opposition brief a supplemental affidavit from a member laboratory. (Def.'s Reply in Supp. of Def.'s Mot. 13 n.9, ECF No. 19).

clearly intended to benefit Medicare recipients and providers (*see id.* 23), and that the duties those provisions impose on the Secretary are "mandatory, not discretionary" (*id.* 24).

On February 2, 2015, this Court held a hearing on Defendant's motion to dismiss and heard oral argument from the parties.  (*See* Minute Entry, Feb. 2, 2015.)

## II.  LEGAL STANDARDS

### A.  Motions To Dismiss Under Rule 12(b)(1)

Courts consider motions to dismiss for lack of subject matter jurisdiction and lack of standing in accordance with Federal Rule of Civil Procedure 12(b)(1).  *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("[T]he defect of standing is a defect in subject matter jurisdiction[.]"); *Little v. Fenty*, 689 F. Supp. 2d 163, 166 n.3 (D.D.C. 2010) ("[I]t is well established that motions to dismiss for lack of standing are properly considered as challenging the Court's subject matter jurisdiction and should be reviewed under Rule 12(b)(1).").  To survive a Rule 12(b)(1) motion to dismiss, "the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  And "[b]ecause Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under . . . Rule 12(b)(6)."  *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011) (citations omitted).  In so doing, the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, but the court need not "accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations." *Rann*

*v. Chao*, 154 F. Supp. 2d 61, 63 (D.D.C. 2001).  Finally, in reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court "may consider materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## B.  Constitutional Standing To Sue

Plaintiffs must satisfy constitutional standing requirements in order to invoke this Court's subject matter jurisdiction.  *See Lujan*, 504 U.S. at 560–61.  Rooted in Article III of the Constitution—which limits the jurisdiction of the federal courts to certain "Cases" and "Controversies[,]" U.S. Const. art. 3, § 2—the standing doctrine generally reinforces separation-of-powers principles, and in this regard, constitutional standing "acts as a gatekeeper, opening the courthouse doors to narrow disputes that can be resolved merely by reference to facts and laws, but barring entry to the broad disquiets that can be resolved only by an appeal to politics and policy." *Food & Water Watch, Inc. v. Vilsack*, No. 14cv1547, 2015 WL 514389, at *6 (D.D.C. Feb. 9, 2015). Boiled to bare essence, then, "the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant [her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [her] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

The constitutional standing requirement has three elements: a plaintiff must allege an "injury[-]in[-]fact" that is "fairly traceable to the challenged action of the defendant" and is capable of being "redressed" by the Court. *Lujan*, 504 U.S. at 560–61

(internal quotation marks, alterations, and citations omitted).  A plaintiff "bears the burden of showing that [she] has standing for each type of relief sought[,]" *Summers*, 555 U.S. at 493, and individual plaintiffs, like Jane Doe, must show that they have standing to sue in their own right in accordance with the factors set forth above, *see Lujan*, 504 U.S. at 560.  "An organizational plaintiff[,]" like CCLA, "is held to a slightly different standard insofar as it may sue both on behalf of itself and also on behalf of its members, but only to the extent that its members themselves have standing." *Food & Water Watch, Inc.*, 2015 WL 514389, at *8 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977) (footnote omitted)).

## III.   ANALYSIS

Plaintiffs have filed this lawsuit to challenge "[t]he current LCD development process and the resulting LCD policies of the MACs" (Compl. ¶ 2), including and especially those LCDs that "are being applied to deny Medicare coverage for laboratory services" (*id.* ¶ 2(d)).  Ordinarily, parties with Medicare-related claims must first exhaust administrative review procedures before filing suit in federal court.  *See, e.g.*, *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 8 (2000) ("*Illinois Council*") (explaining that the Act requires parties to exhaust administrative remedies with respect to "most, if not all, Medicare claims" prior to seeking judicial review).  However, as explained above, Medicare recipients seeking to advance certain purely legal challenges to LCDs are permitted to proceed directly to federal court without first exhausting agency review, *see* 42 U.S.C. § 1395ff(f)(3), and it appears that Plaintiffs are relying on Jane Doe's presence as a party to the instant lawsuit to avail themselves of this procedural mechanism (*see* Compl. ¶ 3).  This means that the question of

whether Jane Doe is a proper plaintiff—*i.e.*, whether or not she has standing to sue—is pivotal to any analysis of whether the instant complaint is properly before this Court. Consequently, this Court has addressed the question of Doe's constitutional standing at the outset, before any consideration of whether the Court otherwise has subject matter jurisdiction over Plaintiffs' claims.

As explained fully below, the Court has concluded that Doe is not a proper plaintiff because Plaintiffs have failed to demonstrate that she has suffered, or imminently will suffer, an injury-in-fact that is traceable to the action she seeks to challenge. As a result, CCLA may not avail itself of section 1395ff(f)(3)'s direct path to federal court, and there is no other statutory mechanism by which CCLA is entitled to proceed without first exhausting administrative review procedures under the Act. Accordingly, this Court lacks jurisdiction over Plaintiffs' claims, and the instant complaint must be dismissed.

### A. Jane Doe Lacks Standing To Sue, And Therefore The Instant Action Cannot Proceed Directly To Court Under Section 1395ff(f)(3)

No less an authority than the Supreme Court of the United States has explained that "the requirement of injury[-]in[-]fact is a hard floor of Article III jurisdiction that [Congress] cannot . . . remove[] by statute." *Summers*, 555 U.S. at 497. That said, the Supreme Court has also recognized that what Congress *may* do is "create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute." *Warth*, 422 U.S. at 514. In other words, with respect to certain statutes, the alleged violation of a statutorily-created right is, alone, a sufficient injury-in-fact to give rise to Article III standing. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3

(1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."); *see also Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 619 (D.C. Cir. 2006) ("Although it is natural to think of an injury in terms of some economic, physical, or psychological damage, a concrete and particular injury for standing purposes can also consist of the violation of an individual right conferred on a person by statute.").

Not every right conferred by statute inherently gives rise to constitutional standing when it is allegedly violated, however. *See Summers*, 555 U.S. at 496 (remarking, in the context of an alleged right to file regulatory comments created by 16 U.S.C. § 1612, that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing"). And because Plaintiffs here maintain that Jane Doe has standing to sue simply and solely because "Congress expressly gave Jane Doe and other Part B enrollees affected by LCDs the express right to challenge the constitutionality of the Medicare provisions governing such LCDs and also the validity of the LCD on other grounds" (Pls.' Opp'n 17 (citing 42 U.S.C. § 1395ff(f)(3))), the key issue that this Court must address for the purpose of evaluating Jane Doe's constitutional standing is whether the right to sue that Congress has conferred in 42 U.S.C. § 1395ff(f)(3) is the kind of statutory right or entitlement the deprivation of which confers standing to sue in and of itself—an issue that the parties vigorously dispute. (*See* Pls.' Opp'n 16–17; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply") 11–12, ECF No. 19.) Put another way, if the Act confers on Jane Doe a *substantive right* or *entitlement*, then Jane Doe may indeed have a basis for contending that she has standing to sue without any other

allegation of injury, but if the cited statute does not confer such a right (and thus is not of the kind that inherently gives rise to standing), then in order to establish standing Plaintiffs must show that Jane Doe has or will suffer a "concrete and particularized" injury that is "actual or imminent, not conjectural or hypothetical" and "fairly traceable to the challenged action of the defendant[.]" *Lujan*, 504 U.S. at 560.

      1.   <u>Section 1395ff(f)(3) Does Not Create A Substantive Right Or</u>
           <u>Entitlement That Obviates The Need For A Plaintiff To Demonstrate</u>
           <u>An Injury-In-Fact</u>

This Court concludes that section 1395ff(f)(3) of the Medicare Act does not confer a substantive right or entitlement on Medicare recipients such as Jane Doe. The classic example of a statute that creates the type of substantive right that automatically gives rise to standing to sue if violated is the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, which entitles members of the public to disclosure of government agency records upon request unless the information sought falls within one of nine statutory exemptions. *See Zivotofsky*, 444 F.3d at 617–18. As the D.C. Circuit explained in *Zivotofsky*, in the FOIA context, "[a]nyone whose request for specific information has been denied . . . has been injured-in-fact for standing purposes because [they] did not get what the statute entitled [them] to receive." *Id.* The *Zivotofsky* court addressed FOIA by way of example, and it reasoned that section 214(d) of the Foreign Relations Authorization Act ("FRAA"), Pub. L. No. 107-228, 115 Stat. 1350, 1365–66 (2002), was similar to the FOIA statute in that it entitled a United States citizen who was born in Jerusalem to have Israel listed as his country of birth on his U.S. passport, such that the government's refusal to do so constituted a concrete and particularized injury-in-fact for standing purposes. *Zivotofsky*, 444 F.3d at 618–19. Both statutes, the court reasoned, conferred "a tangible benefit" on individuals, "the denial of which

16

constitutes an injury." *Id.* at 619 (quoting *Sargeant v. Dixon*, 130 F.3d 1067, 1070 (D.C. Cir. 1997)).

The same cannot be said of section 1395ff(f)(3) of the Medicare Act.  Plaintiffs are generally correct to observe that "Congress expressly provides Medicare Part B enrollees with standing to challenge the validity of LCDs" in the administrative context (Pls.' Opp'n 14 (citing 42 U.S.C. § 1395ff(f)(5)); furthermore, it is undisputed that section 1395ff(f)(3) of the Act allows Medicare recipients to "seek [judicial] review" of certain constitutional and other challenges to an LCD without first "exhausting other administrative remedies[,]"  42 U.S.C. § 1395ff(f)(3).[5]  However, it is also relatively clear that the benefit that section 1395ff(f)(3) confers—the right to "seek review by a court of competent jurisdiction" without exhausting administrative remedies—is a *procedural* right that is not nearly on par with the tangible *substantive* benefits that are owed to individuals under the FOIA (the right to receive information) and the FRAA (the right to receive a particular designation on an official government document).  *Cf. Allen v. Wright*, 468 U.S. 737, 751–52 (1984) (directing federal courts to answer standing questions "by comparing the allegations of the particular complaint to those made in prior standing cases").

---

[5] Section 1395ff(f)(5) specifically authorizes Medicare recipients "who are in need of the items or services that are the subject of [a] coverage determination" to request administrative review of that determination via the process set forth in subdivision (f).  42 U.S.C. § 1395ff(f)(5).  Section 1395ff(f)(5) states, in its entirety:

> **(5) Standing**
>
> An *action under this subsection* seeking review of a national coverage determination or local coverage determination may be initiated only by individuals entitled to benefits under part A of this subchapter, or enrolled under part B of this subchapter, or both, who are in need of the items or services that are the subject of the coverage determination.

*Id.* (emphasis added).  And among the actions subsection 1395ff(f) authorizes is the beneficiary's or enrollee's right to avail herself of the expedited judicial review process set forth in subsection 1395ff(f)(3).

This Court is not the first to reach the same conclusion about the statutorily-conferred right to file suit, albeit in a different context.  In *Lujan v. Defenders of Wildlife*, the Supreme Court held that the plaintiffs in that case could not rely solely on the so-called "citizen-suit" provision of the Endangered Species Act to satisfy the injury-in-fact requirement for constitutional standing purposes.  *See Lujan*, 504 U.S. at 571–573 (quoting 16 U.S.C. § 1540(g)).[6]  In so doing, the Supreme Court noted that procedural rights *can* form part of the basis for a plaintiff's standing, "so long as the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of [her] standing."  *Id.* at 573 n.8.  Similarly, Plaintiffs in the instant case can only point to an alleged violation of section 1395ff(f)(3) as the basis for the injury-in-fact that supports Jane Doe's standing to sue if they can demonstrate that "disregard of" the statutory right to expedited judicial review under section 1395ff(f)(3) "impair[s] a separate concrete interest of [hers,]" *id.* 572—the alleged violation is not sufficient in and of itself.

The bottom line is this:  unlike the benefits that the FOIA and the FRAA guarantee—*i.e.*, benefits of a type for which alleged deprivation is inherently sufficient to give rise to an injury-in-fact for the purpose of Article III standing—the "fast-track" process that Congress provides to Medicare recipients under certain circumstances in section 1395ff(f)(3) is not a substantive right or entitlement; rather, it is merely an accelerated means to achieve the ultimate end that the recipients seek (review and reversal of an undesirable LCD or NCD).  *Cf. Del. Dep't of Natural Res. & Envtl.*

---

[6] "The so-called 'citizen-suit' provisions of the [Endangered Species Act] provides, in pertinent part, that 'any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter.'"  *Lujan*, 504 U.S. at 571–72 (quoting 16 U.S.C. § 1540(g)).

*Control v. FERC*, 558 F.3d 575, 578–79 (D.C. Cir. 2009) (alleged violation of state's

"statutory procedural right" under the Coastal Zone Management Act of 1972 and the

Clean Air Act to certify federal permit applicant's compliance with state environmental

regulations prior to issuance of permit did not give rise to Article III standing in

absence of alleged concrete injury).  This means that Plaintiffs must do more than rely

upon the existence and alleged violation of a statutory right to sue under section

1395ff(f)(3) in order satisfy the Article III standing requirement in the instant case.

> 2.  <u>Plaintiffs Have Not Alleged That Doe Was Deprived Of The
> Procedural Right The Medicare Act Establishes</u>

Significantly, even if section 1395ff(f)(3) conferred the type of entitlement that

automatically gives rise to Article III standing where deprivation is alleged, Plaintiffs'

complaint *does not allege that Jane Doe has been deprived of that entitlement*, much

less that any such deprivation is fairly traceable to an action or inaction on the part of

the Secretary or her agents.  As noted above, the right upon which Plaintiffs stake Jane

Doe's standing is the right to bring certain legal challenges to LCDs in court without

exhausting administrative remedies, as set forth in section 1395ff(f)(3).  (*See* Pls.'

Opp'n 17.)  But nowhere in the complaint have Plaintiffs alleged that the Secretary or

anyone else has interfered with Jane Doe's exercise of that right by preventing her from

filing a section 1395ff(f)(3) action (thereby depriving her of the right that Congress has

conferred), and, indeed, the fact that Doe is presently before this Court suggests the

opposite is so.  *Cf., e.g.*, *In re Sci. Applications Int'l Corp.*, 45 F. Supp. 3d 14, 31

(D.D.C. 2014) (holding that plaintiffs failed to demonstrate standing based on alleged

violation of right to receive information under the FOIA where plaintiffs "failed to

allege any *actual* deprivation of information" (emphasis in original)).  In other words,

Plaintiffs want this Court to conclude that the injury-in-fact standing requirement is satisfied on the basis of the existence of a statutory right (the right to proceed directly to court under section 1395ff(f)(3)), where there is no accompanying allegation that Defendant has deprived Doe of *that* right; rather, Plaintiffs' complaint is entirely about *other* conduct of the Defendant.  (*See, e.g.*, Compl. ¶ 2(e) (alleging that HHS "has eliminated any meaningful opportunity for laboratories to administratively appeal the application of LCDs to laboratory services by unilaterally suspending" ALJ claim review hearings); *id.* ¶ 18 (asserting that "[t]he Secretary has failed to satisfy the[] statutory requirements" that she "have a plan for providing consistency among different LCDs issued by different MACs" and that she "establish a mediation process to resolve disputes among various stakeholders regarding LCD issues"); *see also* Pls. Opp'n 17 (arguing that *the LCD process* violates the Constitution and the Medicare statutes in various ways).)  Plaintiffs have not cited any other case that permits such a disconnect between the injury upon which standing is purportedly based and the claims the plaintiff has brought, and this Court concludes that such a clear end-run around the injury-in-fact requirement is so inconsistent with standing doctrine that it cannot be countenanced.  *Cf. Summers*, 555 U.S. at 493 (plaintiffs must show "standing for each type of relief sought").  Consequently, here, as in most cases, Plaintiffs must demonstrate Jane Doe's standing to file a lawsuit that challenges the LCD process and clinical testing LCDs by showing that, as a result of the LCD process and/or specific LCDs, Doe has suffered a "concrete and particularized" injury that is "actual or imminent, not conjectural or hypothetical[.]"  *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

3. <u>Plaintiffs Have Failed To Establish That Jane Doe Has Suffered Any Injury Whatsoever</u>

Unfortunately for Jane Doe, Plaintiffs' complaint fails to satisfy the actual injury-in-fact test by any measure.  For example, although Plaintiffs contend generally that the denial of Medicare coverage for Jane Doe's pharmacogenomic testing pursuant to an anti-testing coverage LCD "jeopardize[d] her . . . access to medically necessary laboratory services" (Compl. ¶ 6), it is undisputed that Doe and her doctor were indeed able to access the test results at issue notwithstanding the coverage denial and that she was not charged personally for any testing expenses (*see* Pls.' Opp'n 15; Def.'s Br. 9).  This means that it cannot be said that Jane Doe has suffered any actual injury as a result of any of the LCDs she seeks to challenge.

What is more, Plaintiffs' allegations do not establish any certain and imminent *future* injury to Jane Doe arising out of the anti-testing coverage LCDs.  *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013) ("[T]hreatened injury must be certainly impending to constitute injury in fact and . . . allegations of possible future injury are not sufficient." (internal quotation marks, citation, alterations, and emphasis omitted)).  In this regard, Plaintiffs assert that Jane Doe's health conditions will "requir[e] her continued use of the medications prescribed by her doctors[,]" and that "[c]linical laboratory testing regarding the potential side effects and allergies from the drugs continue to be an issue for her[.]"  (Pls.' Opp'n 16.)  But Plaintiffs do not contend that Jane Doe's doctor has ordered (or imminently will order) further clinical testing of the type challenged here, and even if Plaintiffs had alleged that a further testing order is imminent, Plaintiffs have neither alleged nor established that there is a "substantial probability" that Medicare would once again deny coverage, to Jane Doe's

detriment. *Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014) (internal quotation

marks and citation omitted).  Rather, Plaintiffs acknowledge that "different MACs in

different regions might treat the same type of laboratory test differently from a

coverage standpoint" (Compl. ¶ 20)—meaning that Medicare just might cover a

pharmacogenomic test that Jane Doe's doctor orders in the future, depending on the

regional MAC to which the laboratory that performs the hypothetical future test is

assigned.  And if that is not enough to relegate to the realm of the purely hypothetical

Jane Doe's unalleged potential future injury due to Medicare's possible denial of not-

yet-prescribed additional pharmacogenomic testing, Plaintiffs have also failed to allege

that Jane Doe has received, or will receive, an advanced beneficiary notice that would

make her—and not a provider—financially responsible for any clinical testing claims

denied in the future.  *See* CMS, Medicare Claims Processing Manual, Ch. 30 § 40.1.1;

*see also Int'l Rehabilitative Scis. Inc.*, 688 F.3d at 998 (citing 42 C.F.R. § 411.404)

(explaining that Medicare providers bear the financial risk of coverage denials in the

absence of written advance beneficiary notices shifting financial responsibility to

Medicare recipients).

In sum, Plaintiffs may not rely on section 1395ff(f)(3) alone to satisfy the injury-

in-fact requirement for standing purposes, and this is especially so given that Plaintiffs

have not even alleged a deprivation of the procedural right that section 1395ff(f)(3)

confers.  Moreover, Plaintiffs have otherwise failed to satisfy the injury-in-fact

requirement because they do not allege that Jane Doe has suffered any actual physical,

financial, or other concrete injury as a result of Defendant's actions.  And there is such

a "speculative chain of possibilities" regarding the potential for denial of coverage for

clinical testing in the future that "injury based on potential future [testing] is [not]

certainly impending[.]" *Clapper*, 133 S. Ct. at 1150.  Accordingly, this Court finds that

Plaintiffs have failed to demonstrate that Jane Doe has suffered (or imminently will

suffer) an injury-in-fact, and therefore, Jane Doe lacks constitutional standing to

maintain the instant suit.

### B.  This Court Lacks Federal Question Jurisdiction Over CCLA's Claims

Because Jane Doe has no constitutional standing to sue, CCLA is the sole

remaining plaintiff in this action, and section 1395ff(f)(3)'s direct path to judicial

review is not available to advance the claims in the instant complaint.  *See* 42 U.S.C.

§ 1395ff(f)(5) (providing that only Medicare recipients may seek review of coverage

determinations of LCDs under subdivision (f), which includes the right to file a lawsuit

in court with respect to certain claims under section 1395ff(f)(3)).  This circumstance

thus raises the question of what, if any, jurisdictional basis CCLA has to pursue its

unexhausted Medicare-related claims in federal court?

CCLA maintains that this "Court has jurisdiction under 28 U.S.C. § 1331 to

resolve the very important federal questions, including the significant constitutional

issue, posed by the Complaint."  (Compl. ¶ 3.)  However, it is well established that

section 405(h) of the Social Security Act (as incorporated into the Medicare Act

through 42 U.S.C. § 1395ii) expressly *limits* the availability of general federal question

jurisdiction in the Medicare context.  *See* 42 U.S.C. § 405(h) (providing that "[n]o

action . . . to recover on any claim" arising under the Medicare Act shall be "brought

under section 1331 . . . of title 28").  Indeed, according to the Supreme Court, the effect

of section 405(h) is to "channel[] most, if not all, Medicare claims through" agency

review procedures, *Illinois Council*, 529 U.S. at 8, and it is only after the exhaustion of

all applicable administrative remedies that Medicare "claimant[s] can seek judicial review pursuant to the Medicare Act, which contains its own jurisdictional provision separate from section 1331's grant of federal question jurisdiction[.]" *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 706 (D.C. Cir. 2011); *see also* 42 U.S.C. § 1395ff(b)(1)(A) (providing for "judicial review of the Secretary's final decision"). This channeling requirement is a significant part of the Medicare scheme because it "assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts[,]" *Illinois Council*, 529 U.S. at 13; however, it is clear that "section 405(h) is intended to postpone judicial review, not totally preclude it," *Council for Urological Interests*, 668 F.3d at 708 (citing *id.* at 19). Consequently, there is an exception to section 405(h)'s channeling requirement in cases "where its application . . . would not lead to a channeling of review through the agency, but would mean no review at all." *Illinois Council*, 529 U.S. at 17. Put another way, the only circumstances in which courts do not apply the channeling requirement to Medicare-related actions is where doing so would result in "*complete* preclusion of judicial review" because there would be no final administrative decisions from which to appeal at a later date. *Id.* at 23 (emphasis in original).

That exception is not implicated here. CCLA acknowledges that its members (clinical laboratories) may appeal individual clinical testing coverage denials through the Medicare claims review process; in fact, CCLA represents that several of its members are currently pursuing or planning to pursue such appeals. (*See* Compl. ¶ 24; Pls.' Opp'n 13.) Yet, CCLA contends that access to the standard claims review process

does not bar federal question jurisdiction in the instant case because that process cannot grant CCLA's members the relief they seek: invalidation of certain clinical testing LCDs.  (*See* Pls.' Opp'n 20–22.)  CCLA does not explain why such relief is unavailable to a member who seeks judicial review under section 1395ff(b)(1)(A) after the Secretary has rendered a final decision with respect to the initial coverage determination.  *See Illinois Council*, 529 U.S. at 23 (explaining that, once a Medicare claim has been channeled through the administrative process, a reviewing court "has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide").  Moreover, and in any event, it is clear beyond cavil that the mere fact that a plaintiff cannot receive under the administrative review process the particular type of relief sought in court is not material to the applicability of the channeling requirement.  *See id.* ("The fact that the agency might not provide a hearing for [a] *particular contention*, or may lack the power to provide one is beside the point because it is the 'action' arising under the Medicare Act that must be channeled through the agency." (emphasis in original) (citations omitted)); *see also Three Lower Cntys. Cmty. Health Servs., Inc. v. U.S. Dep't of Health and Human Servs.*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007) ("The Supreme Court has made clear that if this process is available, it must be followed, even if it is time-consuming, and even if the agency cannot grant the relief sought." (citing *id.* at 20, 22–23) (footnote omitted)).

The D.C. Circuit's opinion in *Council for Urological Interests v. Sebelius* is not to the contrary, and CCLA's reliance on that case to assert that this Court can exercise federal question jurisdiction here is misplaced.  In *Council for Urological Interests*, an association of urologic laser surgery equipment providers invoked general federal

question jurisdiction to challenge regulations that effectively prevented the association's members from receiving Medicare reimbursements for use of their equipment. *See Council for Urological Interests*, 668 F.3d at 705–06. The Court of Appeals held that section 405(h) channeling did not apply to the association's claims, in large part because it was undisputed that the association's members did not qualify as Medicare providers under the Act, and thus neither the plaintiff nor its members could participate in the Medicare claims review process as a matter of law. *See id.* at 707, 714. That is clearly not the case here—it is undisputed that CCLA's members are Medicare providers that are entitled to appeal initial coverage determinations through the administrative Medicare claims review process. (*See* Compl. ¶ 24 ("Several of the laboratory members of CCLA currently have administrative appeals pending and/or will be filing additional appeals[.]")) Consequently, unlike in *Council for Urological Interests*, the administrative process is available to CCLA's members, and as a result, this Court finds that CCLA's claims are subject to section 405(h) channeling and the Court's exercise of federal question jurisdiction is foreclosed. *See, e.g.*, *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816–17 (D.C. Cir. 2005) (applying section 405(h) channeling requirement to associational plaintiff's claims where some, though not all, of plaintiff's members had access to administrative review); *see also* 42 U.S.C. § 1395ff(b)(1)(A) (entitling "any individual" who is "dissatisfied with any initial [coverage] determination" to seek "judicial review" after the Secretary makes a "final decision" with respect to their claim).

CCLA appears to argue that, even if the channeling requirement applies, this Court should excuse CCLA and its members from exhausting the administrative

processes that channeling ordinarily entails—*i.e.*, that the Court should not wait for the Secretary to issue a final decision before allowing CCLA to seek judicial review.  (*See* Pls.' Notice of Suppl. Auth., ECF No. 22 (attaching *Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, No. 14cv0950, 2015 WL 65129 (D.D.C. Jan. 6, 2015).) Specifically, CCLA points to a recent decision from this district in which the district judge "excuse[d] the exhaustion requirement" with respect to a plaintiff's "purely legal challenge" under the Act on the grounds that administrative exhaustion of such a claim would be futile.  *Nat'l Ass'n for Home Care & Hospice, Inc.*, 2015 WL 65129 at *5. Notably, the plaintiff in that case—the National Association for Home Care and Hospice ("NAHC")—did not seek to invoke general federal question jurisdiction under 28 U.S.C. § 1331, as CCLA does here, but instead claimed jurisdiction under "42 U.S.C. § 405(g) as incorporated by 42 U.S.C. § 1395ff[,]" NAHC's Complaint at ¶ 8, Nat'l Ass'n for Home Care & Hospice, Inc., No. 14cv0950, 2015 WL 65129 (D.D.C. Jan. 6, 2015); *see also* 42 U.S.C. § 1395ff(b)(1)(A), and the plaintiff also made a specific argument that requiring exhaustion of the standard claims review process would be futile in light of the particular circumstances presented in that case, relying on section 405(g) precedent.  *See Nat'l Ass'n for Home Care & Hospice, Inc.*, 2015 WL 65129, at *4 (analyzing NAHC's futility arguments); *see also id.* ("In determining whether to excuse the exhaustion requirement [under section 405(g)], courts consider (1) whether the claim is collateral to a demand for benefits, (2) whether delay would cause irreparable harm, and (3) whether exhaustion would be futile." (citing *Tataranowicz v. Sullivan*, 959 F.2d 268, 274 (D.C. Cir. 1992)).

By contrast, CCLA has made no such "futility" argument here, nor has it pled sufficient facts to enable this Court to determine whether exhaustion of the Medicare claims review process would indeed be futile in the circumstances presented in this case. *See Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) (holding that section 405(g)'s "final decision" requirement is "something more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility"); *see also Tataranowicz*, 959 F.2d at 275 (explaining that courts determining whether or not to excuse exhaustion on the grounds of futility in the Medicare context must consider whether "judicial resolution of the statutory issue (1) will not interfere with the agency's efficient functioning; (2) will not thwart any effort at self-correction; (3) will not deny the court or parties the benefit of the agency's experience or expertise; and (4) will not curtail development of a record useful for judicial review"). Consequently, this Court finds that it has no basis for concluding that the requirement of exhausting the Medicare claims review process should be excused with respect to CCLA's claims, and having failed to exhaust these administrative remedies, CCLA has also failed to establish that this Court has subject matter jurisdiction over its complaint.

## C. This Court Lacks Mandamus Jurisdiction Over CCLA's Claims

CCLA's final jurisdictional argument—that this Court has jurisdiction "to mandate the Secretary's compliance with the mandatory constitutional and statutory provisions at issue" pursuant to the mandamus authority that 28 U.S.C. § 1361 provides (Compl. ¶ 3)—fares no better. The mandamus statute grants jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

There is no question that "the remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980).  Accordingly, "[a] court may grant mandamus relief 'only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff.'"  *Baptist Mem'l Hosp.*, 603 F.3d at 62 (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).  Moreover, the alleged duty must be "'ministerial and the obligation to act peremptory and clearly defined.  The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable.'"  *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C. Cir. 1995) (quoting *13th Reg'l Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).  And, furthermore, "even if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc).

Here, CCLA requests "[a]n order mandating the Secretary and her agents, including MACs, to comply with all applicable provisions of the Constitution and the Medicare Act[.]"  (Compl. 19, ¶ C.)  As a threshold matter, this Court notes that mandamus jurisdiction only conceivably applies to three of the five counts of the complaint—Count I challenges Congress's delegation of authority to MACs to issue LCDs, and thus falls entirely outside of the scope of this Court's mandamus jurisdiction with respect to the Secretary and her agents (*see* Compl. ¶¶ 36–38), and CCLA does not appear to argue for mandamus jurisdiction with respect to Count III, which alleges that MACs are using impermissible criteria under the Act to develop LCDs (*see id.* ¶¶ 41–44).  Instead, CCLA contends that mandamus jurisdiction exists with respect to Counts

II, IV, and V because, according to CCLA: under section 1395hh(a)(2) of the Act,
"Medicare statements of policy, such as LCDs, must be promulgated pursuant to the
rulemaking requirements of the APA" (Pls.' Opp'n 23 (citing 42 U.S.C.
§ 1395hh(a)(2))); under section 1395y(*l*)(5)(A), "the Secretary must develop a plan to
evaluate new LCDs" (*id.* (citing 42 U.S.C. § 1395y(*l*)(5)(A))); and under section
1395ff(i), "the Secretary must establish a mediation process to address disputes
regarding LCDs" (*id.* (citing 42 U.S.C. § 1395ff(i))).[7]  This Court concludes that CCLA
has neither demonstrated that it has any clear right to an order requiring the Secretary to
comply with these procedural mandates, nor has it shown that the Secretary has any
clear, nondiscretionary duty to act under the provisions at issue.  *See, e.g.*, *Baptist
Mem'l Hosp.*, 603 F.3d at 62.

   With respect to its right to seek relief, CCLA contends that these statutory
provisions "are all clearly intended to benefit Medicare recipients and those entities
supplying and providing services and other medical items to them" (*id.* 24), in part
because these groups are "interested 'stakeholders' in any Medicare policy-making
process or procedure" (*id.* 23; *see also id.* ("If the statutory provisions at issue here are
not for Medicare beneficiaries/enrollees and the entities furnishing services to them,
then for whose benefit are they intended?")).  This argument is clearly speculative and
entirely unsupported, and thus manifestly insufficient to establish clearly and
undisputedly that the cited statutory provisions give rise to any duties owed to CCLA or

---

[7] Plaintiffs also suggest that 42 U.S.C. § 1395ff(d)(3)—which relates to timing for ALJ hearings in the
Medicare claims review process—imposes a mandatory duty on the Secretary that gives rise to
mandamus jurisdiction in the instant case.  (*See* Pls.' Opp'n 23 ("[U]nder 42 U.S.C. § 1395ff(d)(3), the
Secretary must furnish timely ALJ hearings for suppliers and providers impacted by the LCDs.").  But
Plaintiffs' complaint does not allege a violation of section 1395ff(d)(3).  Consequently, whether or not
mandamus jurisdiction is appropriate with respect to that statutory provision is not relevant here.

to its members such that CCLA would have a clear right to mandamus relief in the instant case.  And the existence of a duty owed specifically to CCLA or its members is hardly obvious: for example, the plain language of section 1395y(*l*)(5) of the Act (which concerns, *inter alia*, developing a plan to evaluate new LCDs for consistency) suggests that the interests at stake in this provision are "national[]" interests in "consistency" and avoiding "duplication of effort" in the administration of a large and complex government program, 42 U.S.C. § 1395y(*l*)(5)—*not* the individual interests of providers.  *See, e.g.*, *Jarecki v. United States*, 590 F.2d 670, 675 (7th Cir. 1979) (finding that mandamus relief is precluded where the statutory provision at issue does not "compel a duty running directly to the plaintiff") (internal quotation marks omitted); *cf. Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 ("This Court repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law. . . .") (internal quotation marks and citations omitted).[8]

---

[8] Section 1395y(*l*)(5) reads as follows:

> **(5) Local coverage determination process**
>
> **(A) Plan to promote consistency of coverage determinations**
>
>   The Secretary shall develop a plan to evaluate new local coverage determinations to determine which determinations should be adopted *nationally* and to what extent *greater consistency* can be achieved among local coverage determinations.
>
> **(B) Consultation**
>
>   The Secretary shall require the fiscal intermediaries or carriers providing services within the same area to consult on all new local coverage determinations within the area.

And even if the statutory provisions at issue created duties that the Secretary owed to CCLA or to its members, CCLA has not shown that any of the duties alleged are nondiscretionary or "ministerial" such that they could give rise to mandamus jurisdiction. *See Shoshone Bannock Tribes*, 56 F.3d at 1480. In this regard, CCLA's sole argument appears to be that sections 1395hh(a)(2), 1395y(*l*)(5)(A), and 1395ff(i) of the Act all contain the word "shall" (*see* Pls.' Br. 24–25), which CCLA characterizes as "mandatory, not discretionary, language" (*id.* 24). But it is well established that the mere presence of the word "shall" in a statutory provision is not sufficient to indicate that a duty is nondiscretionary for mandamus purposes. *See, e.g., United States v. Clarke*, 628 F. Supp. 2d 1, 11 (D.D.C. 2009) ("[T]he Supreme Court has instructed that when 'shall' is used in an enforcement provision, it should be construed to confer discretion on an agency unless the statute or regulations provide substantive standards that constrain the exercise of discretion." (footnote omitted) (citing *Heckler v. Chaney*, 470 U.S. 821, 835 (1985))). Thus, without more, CCLA has failed to persuade this Court that the cited statutory provisions "not only authorize the demanded action, but require it[.]" *Shoshone Bannock Tribes*, 56 F.3d at 1480.

This is especially so with respect to section 1395ff(i), which CCLA argues confers a nondiscretionary duty on the Secretary to establish an LCD dispute mediation

---

**(C) Dissemination of information**

   The Secretary should serve as a center to disseminate information on local coverage determinations among fiscal intermediaries and carriers *to reduce duplication of effort.*

42 U.S.C. § 1395y(*l*)(5) (emphasis added).

process.  (*See* Compl. ¶ 49.)[9]  Contrary to CCLA's assertions, this Court agrees with Defendant that the duty imposed on the Secretary in section 1395ff(i) is discretionary (*see* Def.'s Reply 19–20), for at least two reasons.  First of all, the text of section 1395ff(i) plainly states that mediation will occur only "when[] the regional administrator (as defined by the Secretary) involved determines that" such dispute resolution is required.  42 U.S.C. § 1395ff(i)(2).  Second, in making that determination, the text requires the regional administrator to use his or her judgment to assess, *inter alia*, whether "there was a systematic pattern and a large volume of complaints from" groups representing service providers or suppliers.  *Id.*  Thus, the statute clearly reserves a considerable amount of discretion to agency actors, and such discretion renders mandamus entirely inappropriate in this context.  *See Shoshone Bannock Tribes*, 56 F.3d at 1480.[10]

---

[9] Section 1395ff(i) provides:

> **(i) Mediation process for local coverage determinations**
>
> **(1) Establishment of process**
>
> The Secretary shall establish a mediation process under this subsection through the use of a physician trained in mediation and employed by the Centers for Medicare & Medicaid Services.
>
> **(2) Responsibility of mediator**
>
> Under the process established in paragraph (1), such a mediator shall mediate in disputes between groups representing providers of services, suppliers (as defined in section 1395x(d) of this title), and the medical director for a Medicare administrative contractor whenever the regional administrator (as defined by the Secretary) involved determines that there was a systematic pattern and a large volume of complaints from such groups regarding decisions of such director or there is a complaint from the co-chair of the advisory committee for that contractor to such regional administrator regarding such dispute.

42 U.S.C. § 1395ff(i).

[10] CCLA's response that section 1395ff(i) "requires the establishment of a mediation process regardless of the number of mediations that will occur" (Pls.' Opp'n 24)—*i.e.*, that subsection (1) should be read in isolation—is unpersuasive.  The Supreme Court has repeatedly stated that the meaning "'of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'"  *Yates v.*

In short, because CCLA has thus failed to show either that it has a clear right to mandamus relief or that the Secretary had any clear, nondiscretionary duty to act, this Court need not consider the third prong of the mandamus test (whether other adequate remedies are available to CCLA).  *See Baptist Mem'l Hosp.*, 603 F.3d at 62.  Instead, this Court concludes that the extraordinary circumstances necessary to justify mandamus are not present in the instant case, and therefore declines to exercise mandamus jurisdiction over CCLA's claims.  *See In re Cheney*, 406 F.3d at 729.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' allegations do not establish that Jane Doe has an injury-in-fact that gives rise to standing to sue, and as a result, the fast-track pathway to judicial review that section 1395ff(f)(3) establishes is not available as a mechanism for Plaintiffs' complaint to proceed in federal court.  Nor has CCLA established that any other statutory mechanism entitles it to proceed on the instant claims without first exhausting administrative review under the Medicare Act.  Consequently, Defendant's motion to dismiss will be **GRANTED**, and Plaintiffs' complaint will be dismissed.

DATE:  May 20, 2015

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

---

*United States*, 135 S. Ct. 1074, 1081–82 (2015) (alterations in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Smith v. United States*, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute.").